## John Dillin v. The People.

Where, on a trial for murder, it appeared that the deceased had been absent from the neighborhood of the prisoner some eight or ten months preceding the alleged offense;— *Held* competent for the prosecution to show the state of feeling between the prisoner and the deceased immediately preceding such absence.

Where evidence is ruled out as not proper on cross-examination, the correctness of the ruling will not be inquired into where it appears that the witness is afterwards called by the party offering the evidence, and examined fully on the subject.

Where on a trial for murder, a witness for the prisoner is examined as to the prisoner being present and transacting business at a place near the scene of the alleged murder, and near the time it was claimed to have been committed, it is not improper to permit the prosecution to show, by the cross-examination of the witness, any facts having a tendency to show from which direction the prisoner came to that place; as, that the witness went out and found tracks which, at the time, he believed and stated were the prisoner's, coming towards that place; and the like.

It is competent for a court to admit evidence which will not be relevant unless brought home to the prisoner by further proof. But if such further proof is not given, it is the duty of the court to strike out the evidence so admitted.

The prosecution, on undertaking subsequently to connect the prisoner with it, were permitted to show a corrupt agreement of the father and one of the counsel of the prisoner to keep an important witness away from the trial. No evidence was given bringing this agreement home to the prisoner. The court charged the jury that they were at liberty to take into consideration and determine, from all the evidence, whether the inducements held out to the witness to

keep away, were by the authorized agents of the prisoner. — *Held* erroneous, and that the court should have instructed the jury to discard entirely the evidence of this agreement.

Where evidence was given by the prosecution which indicated strong mental agitation and excitement on the part of the prisoner, with an attempt to conceal it, immediately after the time when (as the evidence tended to show) the murder was committed, it was *held*, that the prisoner was entitled to prove the conversation had by him at the time, as bearing upon the question of his mental agitation and excitement, and tending to disprove the excitement or to show its nature and extent.

*Heard April 28th. Decided June 9th.*

Error to Barry Circuit.

The plaintiff in error was charged with the murder of Jane Harding, on the thirty-first day of May, 1858. On the trial, at an adjourned term of said court, in November, 1858, James Ransom, a witness for the prosecution, testified that the deceased was the wife of Abram L. Harding, and formerly lived in Maple Grove, in Barry county. She removed from Maple Grove in September, 1857, to Napoleon, in Jackson county. Before this removal, and some time in August, 1857, her house was burned up. She came back to the house of witness in Maple Grove, May 15th, 1858, and stayed there until May 31st. Witness saw her on the morning of the 31st, alone, on foot, going east past his house. She said she was going to the post office, and over into the east settlement to Mr. Anderson's. Witness next saw her dead in the woods on the 16th of June following. From May 31st to June 16th search was made for her, and she was found on the day last named, about twenty-four rods west of a north and south road running through Maple Grove, dead, and partially buried with rotten wood, leaves and barks. Dillin had lived at Maple Grove on a forty acre lot adjoining a half acre occupied by the deceased in 1857. He had wheat on this forty acres in 1857.

The prosecution was then permitted to prove by this witness, under objection for want of relevancy, that this wheat was put up in stacks, and was burned up on the 12th of August, 1857; that the house of the deceased

was burned the same day, and that he saw them both burning at the same time.

The witness further testified that difficulties arose between the deceased and the prisoner about the burning of the house and wheat stacks, and that the prisoner and five others were complained of by the deceased for burning her house, and an examination had before a magistrate on the complaint, on which the deceased was examined as a witness.

The prosecution afterwards called George W. Hutchinson, who having given important evidence, and having also testified that he was a witness on the examination of the prisoner for the murder, before a magistrate, and was recognized to appear as a witness on this trial, was asked the following question: "Since that time has any effort been made to have you leave and not appear in this cause as a witness?" To which question the prisoner's counsel objected that it was inadmissible to prove efforts to induce the witness to leave, made by any person except the prisoner, or some one authorized by him for that purpose. The prosecution replied that they expected to trace it to the prisoner. The objection was then overruled by the court, and the witness answered; "I dont know how to answer that. I can go on and tell the whole story." The prosecution then asked the following question: "State whether you had any conversation with Mr. Brackett, one of the counsel for the prisoner in this case, about going away and not appearing as a witness on this trial." To which the prisoner's counsel objected, but the prosecution stating that they expected evidence would be elicited to satisfy the jury of the prisoner's connection with it, the objection was overruled, and the witness testified as follows:

"I had conversation with Mr. Brackett about my not appearing as a witness. It was at Belleview, in September last. I told Mr. Brackett that if I had money I

would go away. Mr. Brackett said he guessed the money could be got. Mr. Peter Dillin, the father of the prisoner, was present, and Brackett proposed to Mr. Dillin that I wanted to borrow some money. After a while Mr. Brackett told me that I could get the money of Henry Hickok. I saw Mr. Hickok, and he proposed to give me $15, and a pair of boots, if I would go to Kansas and look up a man for him. I told him I would go for $20. The contract was finally made in writing. The agreement to be put in writing was, that if I staid away until the first of April next, then I was to pay nothing; but if I came back before the trial, then I was to pay back, with ten per cent. interest. Mr. Brackett drew the contract. The whole thing was well understood between me and Brackett. After the first talk with Brackett about going away, I saw Peter Dillin at Mr. Brackett's office. Brackett had told me my bail would not be liable. I went to Brackett's office to get the money to go away with. Brackett had sent word to Peter Dillin to be present. He was present. Peter Dillin had before said he would try to raise the money; that it was hard work for him to raise money to get the witnesses for the defense. Hickok gave me the money the next day. The money was paid in Brackett's office, and Brackett was present." The witness further testified that he left and went to Marshall the next day, and from there to Detroit, and did not return at the next regular term of the court in October. He afterwards wrote to the sheriff to come after him, and was brought back.

The prosecution then called Polly Carpenter, who testified that on May 31st, 1858, the prisoner came to the house of her husband on said north and south road in Maple Grove, and about forty rods north of the house of Aaron Brooks, and left about eleven o'clock in the forenoon. On cross examination she stated that he was there about an hour. When he had been in there a spell, he asked for a book.

DILLIN v. THE PEOPLE.

The prisoner's counsel then asked the witness the following questions: What did he do while in the house? What did he talk about? Did he tell you where he came from? Did he tell you where he was going? While at your house did he inquire for any one? All of which questions were objected to as inadmissible on cross examination, and the objection sustained. But the witness was afterwards called for the defense, and was allowed to testify, and did testify, as to what the prisoner talked about on this occasion, and was allowed to testify fully as to what he said about Mrs. Harding.

Asa E. Lapham, was also called for the prosecution, and testified that on May 31st, 1858, at some time between twelve and one o'clock, witness was at the post office on said north and south road, kept by Hyde. While there, and about 15 minutes after his arrival, the prisoner came into the office, and staid some ten or fifteen minutes. When he came in, he appeared warm. Witness noticed perspiration on his forehead. He leaned back in his chair, and then leaned forward several times. "There was something in his appearance that I can not describe. There was a kind of excitability about his manner that I can not describe. He seemed to have the appearance of being excited, and at the same time trying to conceal it."

On his cross examination the witness testified that the prisoner made an errand at the office. The prisoner's counsel then inquired what the errand was? To which question the prosecution objected, and the court sustained the objection.

The witness further testified that the prisoner bought some letter stamps while there, and had conversation with Hyde, Carpenter and the witness, but the witness was not permitted by the court to state what the conversation was.

Carpenter was then called as a witness for the prisoner, and testified to being at the post office at the time spoken of by Lapham, and to the prisoner having made

8 MICH—Y

a contract there. The prisoner's counsel enquired of the witness what the contract was? The prosecution objected to the question, and the court sustained the objection. The prisoner's counsel also asked the witness what the prisoner talked about there?—which question was also objected to by the prosecution, and the objection sustained.

Carpenter further stated on his examination in chief, that Lapham was with him at the post office. He noticed that the prisoner was sweaty when he came in. Did not notice anything else. Did not notice his clothes. On his cross examination, he said he did not know which way the prisoner came from, and did not go out with Lapham to see. The following questions were then put to the witness by the prosecution, under the prisoner's objection that they were not proper on cross examination, and the following answers had.

*Question.* Did you see by the prisoner's tracks which way he came? *Answer.* I can't say that they were his tracks. *Question.* Did you not say to Mr. Lapham on that day, while looking at those tracks, " these are John's tracks?" *Answer.* I don't know as I did. *Question.* Did you not then and there tell Mr. Lapham that you thought they were John Dillin's tracks? *Answer.* I think I did. *Question.* Did you think so? *Answer.* I did. *Question.* Did you see John Dillin before that day? *Answer.* I saw a man that I supposed to be him, going north of the school house,—no body with him. I don't know the exact time. The person I saw was some 30 or 40 rods off. I was chopping some 10 or 15 rods south of the Spencer school house,—by the side of the north and south road.

The testimony being closed, the counsel for the people, in summing up to the jury, commented on the testimony of Hutchinson, relating to the attempt testified by him to have been made by Brackett, Peter Dillin, and Hickok, to hire and induce him, the witness, to go away and not appear as a witness in this cause on behalf of the People;

claiming and arguing that the · same should be received by the jury as tending to establish the guilt of the prisoner.

The counsel for the prisoner requested the court to instruct the jury that they should utterly discard the entire evidence given by Hutchinson in regard to the effort of Brackett, Hickok and others, to induce him to leave and not attend court as a witness in this case. Which instruction the court declined to give, but on the contrary told the jury that they were at liberty to take it into consideration, and determine from all the evidence whether the inducements held out to the witness to leave were by the authorized agents of the prisoner. To this charge, and to the refusal to charge as requested, the counsel for the prisoner excepted.

*S. W. Fowler*, and *C. I. Walker*, for plaintiff in error:

The evidence with respect to the wheat, house, &c., was inadmissible. It could not be admitted to prove the prisoner guilty of another and distinct offense: — 5 *Mich*, 320,—and it falls far short of admissible testimony to prove a state of malicious feeling towards the deceased, or a motive for the crime.

Mrs. Carpenter's testimony as to what the prisoner said at her house, should have been admitted. It was clearly proper to show what he said, in connection with his coming and going, as proved on the part of the people, as a part of the *res gestæ*, showing his business, his proposed destination, &c.

So what the prisoner said, as well as what he did, at the post office, was admissible, not only as a part of the *res gestæ*, but as showing the condition of his mind; whether he acted and conversed naturally or otherwise: *Rosc. Cr. Ev.* 87, 88; 1 *Phil. Ev.* 23; 1 *Greenl. Ev.* 108, 111; 2 *Har. & McH.* 120; 4 *Wash.* 729; 14 *S. & R.* 275; 2 *Hill*, 257; 10 *Cush.* 253.

Hutchinson's testimony, unconnected with any proof having a legal tendency to prove the authority of the prisoner to make the arrangement sworn to, was clearly improper, and it was the duty of the court to charge the jury that it was not to be considered by them:—19 *Wend.* 202; 11 *S. & R.* 134; 31 *Pa. St.* 193. As it was, the charge really left it to the jury to find him guilty, from the conduct of an unprincipled attorney and a weak and frightened father, proved by a corrupt witness, but in no way brought home, by evidence, to the prisoner. This was error:—1 *Dutch.* 656.

*J. M. Howard, Attorney General,* and *H. D. Terry,* for the People:·

The instruction asked to the jury, to discard the evidence of Hutchinson, *assumed* that there was no evidence whatever before the jury, tending to show a privity on the part of the prisoner in the attempt to keep' Hutchinson away from the trial; and the court was, in effect, called upon to tell the jury so. This was to demand of the judge to pass upon that important question of fact; a fact which is no where conceded in the bill of exceptions. For aught that appears, there may have been abundant evidence showing his connection with the scheme. The bill should show that there was no evidence conducing to prove it; but it being silent on the subject, this court will not presume the court below committed an error. A bill of exceptions does not draw the whole matter into examination, but only the points to which it is taken; and the party must be able to lay his finger on the points which arise, either in the admission or rejection of evidence, or in a matter of law arising from a fact not denied, and in which he is overruled by the court:—8 *Johns.* 495; 2 *Pet.* 1. When the bill does not purport to contain all the evidence, it will be presumed that the evidence, if set forth, would sustain the charge:—29 *Ala.* 322; 4 *Ind.* 266.

The rejection of the question put to Mrs. Carpenter, on her cross examination, was correct.

The only object of the prosecution in producing evidence of this interview, was to show the prisoner to have been in the neighborhood. They had not asked the witness what the prisoner did or said while at that place. What he did or said could have had no tendency to disprove the fact of his presence. The prosecution had not proved that he there made any preparations or threats to commit violence upon the deceased; and, therefore, the evidence sought to be drawn out on cross-examination, was not a part of the *res gestæ*. It was in fact, an attempt to cross-examine on subjects not at all embraced in the direct examination, and therefore objectionable as coming within the rule laid down in *Horton's case*, 4 *Mich. Rep.* 80, &c.

To make such declarations and acts admissible as *res gestæ*, it must appear that they were concomitant with the principal act, and so connected with it as to be regarded as the mere result and consequence of co-existing motives, in order to form a proper criterion for directing the judgment which is to be formed upon the whole conduct; (1 *Greenl. Ev.* § 110), and much must in such cases necessarily be left to the sound discretion of the Judge, it being impossible to adopt any definite rule applicable to all cases, (*Ibid.* § 108).

What Dillin said about *other* matters could, of course, afford no inference in his favor touching the homicide, and was foreign to the subject. The declaration and the act must be *connected* in point of time, in order to make the former admissible: — 4 *Pick.* 378; 11 *Pick,* 378, 308.

The court did not err in excluding evidence of what was said and done by the prisoner at the post office.

The bill of exceptions does not disclose whether this visit to the post office was before or after the homicide. If before, then what the prisoner said would seem to be immaterial, as being no part of the *res gestæ;* or, if it had

any bearing, it must have been against the prisoner, and so he has nothing to complain of. If after, his declarations were inadmissible in his own favor. But it being uncertain from the bill of exceptions whether it was before or after, this court, presuming neither way, will not hold that the court erred in excluding them.

MARTIN CH. J.:

The testimony of Ransom respecting the wheat, was competent. The object of the prosecution evidently was, to show the existence of ill will upon the part of the prisoner towards the deceased; and the whole testimony of this witness, so far as set out in the bill of exceptions, tends to show, and was evidently produced for the purpose of showing, that such ill will and malice existed. It is objected that the occurrence was too long prior to, and remote from, that of the homicide; but this can hardly be contended when we bear in mind that Mrs. Harding left the neighborhood of the prisoner, and removed into another county, immediately after the event to which the witness testifies, and did not return until a few days before the murder. The state of feeling existing between the accused and the victim, at and about the time of the alleged crime, is always a subject of legitimate inquiry; and so are facts and circumstances which tend to show the relations they hold towards each other; and where an interval of time, as in the present case, elapses, within which they are separated, the relations when last residing in each others' neighborhood may be shown. The inquiry is pertinent; the only question being as to the value of the testimony, and the weight to be given to it. Thus, if A and B entertain the most hostile feelings towards each other, amounting to deadly hostility, to-day, and A removes from the vicinity of B, remains absent for six months, and then returns, and is found shortly after, murdered, and if circumstances point to B as the murderer, the relations when

last together may be shown, and will have more or less weight with a jury in determining the question of guilt or innocence, according to the other facts and circumstances shown in the case. There was no error, therefore, in admitting this testimony.

Nor was there error in rejecting the testimony of Mrs. Carpenter, as to what the prisoner said at her house on the morning of the alleged murder, and immediately before it, as to where he came from, and where he was going, and whether he inquired for any one. This was sought to be obtained on the cross - examination of the witness; and whether properly rejected or not upon the ground that it was not the proper subject of cross - examination, ample opportunity was given, when the defense had the case, for inquiry respecting these subjects, and the inquiry was pursued then so far as pertinent; or, if not, it was the fault of the prisoner.

There was no error in excluding the testimony of what the prisoner said at the post office; what errand he made there, and what he conversed about. It was not a part of the *res gestæ*, and is conceded to be only admissible as such, or for the purpose of showing the prisoner's state of mind. I am aware of only one class of declarations of a prisoner (and those he can not give in evidence in his own favor unless the subject is first introduced by the prosecution) which do not come within the rule that declarations and acts of the prisoner, to be admissible, must either precede or accompany the act for the commission of which he stands charged; and those are flight, or declarations made when arrested or accused; and these are received as in the nature of confessions or admissions. The state of mind which the law regards and inquires after, in admitting this testimony, is that existing prior to and at the time of the commission of the alleged offense, and not that which is subsequently manifested, unless in immediate connection with the occurrence; and

in the latter case, only for the purpose of determining the character of the act. Whether Dillin, at the post office, was calm or excited, was a question of demeanor, and not of mental condition; and could be determined by the general inquiries allowed to be put to the witnesses who saw him there, and did business with him; and to allow him, under pretence of showing his state of mind at that time, to introduce evidence of what he said, would introduce a rule which, in many instances, and especially in cases of cool and deliberate crime, would enable the perpetrator to manufacture a complete defense; especially in those cases in which direct evidence was wanting, and circumstantial evidence relied upon. The true rule is, that all acts and facts upon which any reasonable presumption of the truth or falsity of the issue can be founded, may be given in evidence; but such acts or facts must precede or be part of the *res gestœ*, and unless as confessions, or given for the purpose of explanation or qualification, the subsequent acts and statements of the party are never admissible. The acts and declarations of the prisoner given in evidence in his favor, ought to be connected, both in point of subject matter and of time, with the acts or declarations proved against him:— *Rosc. Cr. Ev.* 88. And the fact that he appeared warm and excited when he arrived at the post office, will not justify evidence on his part of what he said there, and which he may have made haste to say for the purpose of diverting suspicion or manufacturing a defense.

We discover no error in the ruling of the court in admitting the testimony of Carpenter. The objection appears to have arisen from a misapprehension of the rule laid down in *The People v. Horton*, 4 *Mich.* 67, which was substantially to the effect that a defendant can not, upon cross-examination, inquire respecting matters of defense not fairly connected with the matters testified to on the direct examination, although known to the witness

under {examination; both because it tends to promote confusion, and because the course would give undue advantage to a defendant, by allowing him to prove his case, or some portion of it, through answers to leading questions ; which would violate a cardinal rule of evidence. But the evidence of Carpenter, thus produced, was relevant, and the pertinent subject of cross - examination, as following up the inquiry whether he knew which way the prisoner came from when he reached the post office. His presence there was the subject of investigation; and nothing relating to his coming and presence are within the rule of that case.

The only remaining allegations of error upon which the prisoner relies, are the admission of the testimony of Hutchinson, and the refusal of the court to exclude it from the consideration of the jury. He had been a witness for the People on the preliminary examination before the committing magistrate, and was offered to prove that attempts had been made by the prisoner's counsel and friends to induce him to absent himself from the trial. The objection to his testimony was met by the undertaking, on the part of the prosecution, to connect the prisoner with it; and upon such undertaking it was admitted. There was no error in admitting it under such circumstances; but it was the duty of the court, had such undertaking not been made, or had it failed, to exclude the testimony from the consideration of the jury, when the cause was given to them. Now, it is true that the burden of showing error lies upon the plaintiff in error ; and therefore there must be enough upon the face of the record to show error affirmatively; and that when the bill does not purport to contain all the evidence, it will ordinarily be presumed that if set forth it would sustain the ruling and charge of the court; and it seems to be thought that no error is affirmatively shown in this bill, in the ruling and charge of the court in denying the mo-

tion of the prisoner to strike out such testimony, after the evidence was closed. A careful consideration of the bill of exceptions will show that no attempt was made by the prosecution to redeem the pledge given to connect the prisoner with the transaction. The language of the bill is, that the counsel for the People commented upon Hutchinson's testimony, claiming and insisting that it should be received by the jury as tending to establish the prisoner's guilt. Now if the prisoner were shown to have had cognizance of the attempt to get Hutchinson out of the way, it would and ought to have a very powerful influence upon determining the question of his guilt. Understanding the bill of exceptions to set out substantially that the counsel for the People claimed that this unsupported testimony of Hutchinson should go to the jury, and that the court so ruled, there was error in the ruling denying the motion. Such testimony should only be allowed to go to a jury when some evidence accompanies it, upon which the jury may inquire as to the prisoner's knowledge of and complicity in it; and they should be carefully instructed, even under such evidence, to exclude the testimony from consideration unless the prisoner is found to have been so connected. It is impossible to tell how far this testimony turned the scale against the prisoner. That it must have had some weight, can not be doubted. For this error the judgment must be reversed, and a new trial ordered.

CHRISTIANCY J.:

I agree in the opinion of the Chief Justice, except so far as it relates to the exclusion of what Dillin said at the post office.

The prosecution had proved by Lapham that, on the same day and immediately after (the evidence tended to show) the murder had been committed, he saw the prisoner at the post office, where he, the prisoner, stayed some

ten or fifteen minutes; that "when he came in, he appeared warm. I discovered," he says, "perspiration on his forehead. He leaned back in his chair, and then leaned forward, several times. There was something in his appearance that I can not describe. He held his head in an erect position. There was a kind of excitability about his manner that I can not describe. He seemed to have the appearance of being excited, and at the same time trying to conceal it."

Now this evidence tended to show strong mental agitation and excitement, with an attempt to conceal it; and hence had a strong bearing upon the question of his guilt. The question whether such mental agitation and excitement existed, and the nature and extent of it, became very material and pertinent to the issue; and every thing fairly calculated to show the nature and extent of such agitation was admissible. A man's conversation, under such circumstances, is quite as likely to furnish a fair index of his state of mind, as his motions and external appearance. Under strong mental excitement of the kind which the evidence of Lapham tended to show, the conversation is likely to be somewhat incoherent, disjointed, or to show some want of calmness and deliberation. If nothing of this kind appeared in his conversation, and it evinced calmness, deliberation, and a natural consecutive order of ideas, this would have tended strongly to rebut the inference to be drawn from the external indications of excitement already testified to by Lapham. The jury, therefore, were entitled to have this evidence before them, to enable them properly to estimate the value of the evidence touching the external indications of such excitement. It is very true that, if the prosecution had not introduced the evidence tending to show excitement, the conversation of the prisoner on that occasion would not have been admissible in his favor. It is also true that the jury should have been instructed that, in considering the evidence relating to the conversa-

tions, they were not to consider his statements as evidence of facts stated in his own favor, but that it was only material so far as it bore upon the question of excitement or agitation of mind; unless, indeed, some fact or statement had appeared in the conversation which might bear against the prisoner, as tending to show his guilt, and in such case, that his whole conversation, at the same time and in relation to the same subject, should be considered together.

MANNING and CAMPBELL JJ., concurred with CHRISTIAN-CY J.

*Judgment reversed.*