BOWERMAN v MacDONALD

MOON v BALLINGER

Docket Nos. 80273, 80424. Argued December 8, 1987 (Calendar Nos. 4-
5). Decided July 13, 1988.

Elizabeth A. Bowerman filed a verified paternity complaint and a
motion for blood or tissue tests in the Marquette Circuit Court
against Michael MacDonald. The court, Edward A. Quinnell, J.,
ordered the defendant to submit to blood tests or be held in
contempt. The Court of Appeals, ALLEN, P.J., and CYNAR and
R. C. LIVO, JJ., reversed, holding that a trial court may not
order a blood test until a plaintiff has presented proofs to
support the allegations in the complaint (Docket No. 90776).
The plaintiff appeals.

Kathy A. Moon brought a paternity action in the Gratiot Circuit
Court against Jerry Ballinger. The court, Randy L. Tahvonen,
J., granted a default judgment against the defendant for failure
to submit to a court-ordered blood test. The Court of Appeals,
WALSH and HOOD, JJ. (BEASLEY, J., dissenting), affirmed in an
opinion per curiam, holding that entry of a default judgment
was within the trial court's discretion (Docket No. 85378). The
defendant appeals.

In a unanimous opinion by Justice BRICKLEY, the Supreme
Court *held:*

A verified complaint filed by the mother of a child in accord-
ance with § 4 of the Paternity Act is sufficient ground upon
which to order blood and tissue tests; neither a search warrant
nor an evidentiary hearing is required prior to the ordering of
the tests. A defendant father's refusal to submit to such tests
may be sanctioned by the use of a court's contempt power.
However, the entry of a default judgment against him for
refusal to submit conflicts with the Paternity Act and may not
be used as a sanction.

1. Paternity actions are special creations of the Legislature

REFERENCES

Am Jur 2d, Bastards §§ 104 *et seq.*, 118.

Admissibility and weight of blood-grouping tests in disputed pater-
nity cases. 43 ALR4th 579.

Admissibility, weight and sufficiency of Human Leukocyte Antigen
(HLA) tissue typing tests in paternity cases. 37 ALR4th 167.

and fundamentally civil in nature. The Paternity Act was a significant break from its predecessor statute, introducing the use of new and dispositive types of evidence as well as direction for the application of the rules of civil procedure, including the use of verified complaints and default judgments. Further, the act recognizes the evolution of blood testing technology to determine the probability of paternity with great precision through blood and tissue tests and allows blood test results to be introduced, not only to exclude an alleged father from paternity, but also, if he is not excluded, to determine the likelihood that he is, in fact, the father.

2. Since a paternity action is essentially civil in nature, it is unnecessary to require a hearing to establish probable cause before ordering blood or tissue tests. The order for testing initially is given by a neutral judge who already has the sworn complaint of the plaintiff indicating when and where she was impregnated and that she believes the defendant to be the father of her child. The complaint clearly places the child's and the parties' blood and tissue types in controversy and provides good cause for the motion.

3. Procedure in paternity actions is controlled by the Michigan Court Rules, absent contradiction in the Paternity Act. The court rules provide for a judgment of default and the use of the contempt power against a party who refuses to submit to blood and tissue tests. Section 6(a) of the Paternity Act provides that the refusal of a party to submit to blood and tissue tests must be disclosed at trial. Properly interpreted, the provision precludes use of the default sanction. Default, if applied, would obviate the need for a trial, making impossible the remedy of a trial as mandated by the act.

*Bowerman,* reversed.

*Moon,* reversed and remanded.

157 Mich App 368; 403 NW2d 140 (1987) reversed.

157 Mich App 676; 403 NW2d 194 (1987) reversed.

PARENT AND CHILD — PATERNITY ACT — BLOOD TESTS — DEFAULT — CONTEMPT.

A verified complaint filed by the mother of a child in accordance with § 4 of the Paternity Act is sufficient grounds upon which to order blood and tissue tests; neither a search warrant nor an evidentiary hearing is required prior to the ordering of the tests; refusal by a defendant father to submit to such tests may be sanctioned by the use of a court's contempt power, however, the entry of a default judgment against him for refusal to

submit conflicts with the act and may not be used as a sanction (MCL 722.714, 722.716, 722.717; MSA 25.494, 25.496, 25.497; MCR 2.311, 2.313).

*Gary L. Walker,* Prosecuting Attorney, and *Mary Lou Strisar,* Assistant Prosecuting Attorney, for plaintiff Bowerman.

*Mark A. Gates,* Prosecuting Attorney, and *Keith J. Kushion,* Chief Assistant Prosecuting Attorney, for plaintiff Moon.

*Richard John Jason* for defendant MacDonald.

*Goggin & Baker* (by *William E. Goggin*) for defendant Ballinger.

Amicus Curiae:

*Gerald D. Warner* and *David G. Case* for Prosecuting Attorneys Association of Michigan.

BRICKLEY, J. We granted leave in these two cases limited to three issues. First, whether a search warrant or an evidentiary hearing is necessary prior to a trial court's order of a blood test in a paternity case. Second, whether a defendant father in a paternity case may be held in contempt where he refuses to submit to a blood test. Third, whether a default judgment may be entered in favor of a plaintiff mother in a paternity case where the defendant refuses to submit to a blood test.

We hold that where the mother of a child files a verified complaint in accordance with § 4 of the Paternity Act,[1] neither a search warrant nor an evidentiary hearing is required prior to ordering blood tests. We further hold that a contempt citation is a permissible sanction where the alleged

---

[1] MCL 722.711 *et seq.;* MSA 25.491 *et seq.*

father refuses to submit to the testing, but, that the use of a default judgment conflicts with the Paternity Act.

I

In *Bowerman v MacDonald,* the plaintiff filed a verified paternity complaint and subsequently filed a motion for blood or tissue tests which the court granted. At a pretrial conference, the defendant's attorney notified the court that MacDonald would not submit to the testing. The trial court tentatively ruled that defendant would be held in contempt and would be jailed for thirty days or until he agreed to submit to the tests, whichever occurred first. After a challenge from the defendant and briefing on the issue, the trial judge concluded that contempt was an appropriate sanction, and issued an order to that effect after giving defendant another forty-eight hours to submit to the testing. On appeal, the Court of Appeals[2] did not reach the question of the propriety of the contempt order, since it reversed the trial court's original order that defendant submit to the blood tests. Plaintiff appeals from that decision.[3]

In *Moon v Ballinger,* defendant also refused to submit to blood testing, and the trial court conditionally entered a default judgment in plaintiff's favor pursuant to Michigan Court Rules 2.311 and 2.313. The Court of Appeals[4] affirmed the judgment, and defendant appealed in this Court.

---

[2] *Bowerman v MacDonald,* 157 Mich App 368; 403 NW2d 140 (1987).

[3] The defendant did not cross appeal on the issue of the propriety of the contempt order. However, in light of the similarity to the default issue in *Moon v Ballinger,* we ordered it briefed. Rather than remand this question for Court of Appeals consideration, we resolve it now in the interests of judicial economy.

[4] *Moon v Ballinger,* 157 Mich App 676; 403 NW2d 194 (1987).

II

The nature of paternity actions has undergone considerable evolution since the passage of the original Bastardy Act of 1846.[5] With minor exceptions, the civil aspects of the action, as defined by statute and case law have steadily increased while those aspects reflecting principles of criminal procedure have been reduced or eliminated altogether. Indeed, the Legislature's explicit purpose in passing the 1986 amendment of the Paternity Act was to "make[ ] it finally clear that paternity is a civil issue."[6] In addition, the relevant technology has, over time, developed so as to allow blood and tissue testing to play an increasingly important and probative role in such cases.[7]

At common law, a father had no duty to care for his child born out of wedlock. *State v Lindskog,* 175 Minn 533; 221 NW 911 (1928). In 1846, the Legislature enacted the Bastardy Act to define such a duty and provide a statutory mechanism by which he could be required to fulfill it. The act was said to have two purposes: to require the child's father to provide support, and to protect society from having to provide that support in his stead. *Cross v People,* 8 Mich 113 (1860). Even under this early statute, however, punishment of the father was never among its purposes, and the act did not provide for criminal penalties. Moreover, as is described below, the cases decided pursuant to the Bastardy Act tended to apply civil

[5] 1846 RS, ch 42.

[6] Senate Bill Analysis, SB 225 (June 20, 1986).

[7] For a discussion of these technological developments, see, e.g., Kolins, *The role of paternity testing in cases of disputed parentage,* 63 Mich B J 1169 (1984); comment, *Proving paternity by means of serological testing: Should it be admitted as evidence by the courts?,* 1981 Det C L R 47; *Joint AMA-ABA guidelines: Present status of serologic testing in problems of disputed parentage,* 10 Family L Q 247 (1976).

rules, absent specific statutory instruction to the contrary.

Nevertheless, the proceeding was considered "quasi-criminal," in light of the many aspects of criminal procedure present in the statute. The 1846 statute provided that the mother was to bring her complaint to a justice of the peace in order to "institute a prosecution," following which the justice of the peace was to "take her accusation and examination, in writing, under oath, respecting the person accused, the time when and place where the complainant was begotten with child, and such other circumstances as the said justice shall deem necessary, for the discovery of the truth of such accusation." A warrant was then to be issued for the defendant's arrest. No provision was made for any means of service other than arrest. Upon the delivery of the defendant, the justice of the peace was to "hear[ ] him in his defence" and could then require him to supply a bond or be jailed until trial if he did not supply the bond. The trial was to be by jury, and the verdict was to be in the form of "guilty or not guilty." In addition, the mother of the child was not referred to as "plaintiff" in the statute (she was instead termed "the complainant"), while the alleged father was termed, "the defendant." The action was accordingly instituted in the name of "the people" and representation was by the local prosecutor.

This Court evaluated the Bastardy Act on many occasions. In spite of the numerous aspects of criminal procedure provided for in the act itself, we applied rules of civil procedure in the great majority of cases where the act was silent. We held that the burden of proof was "preponderance of [the] evidence" rather than "beyond a reason-

able doubt,"[8] that extradition could not be had in a bastardy case,[9] that jurisdiction did not lie in a court having a purely criminal jurisdiction,[10] that the paternity defendant need not enter a plea,[11] that any detention of the defendant had to take place in a jail rather than in a prison,[12] that the mother may employ her own attorney,[13] that reversal was not required where there was instructional error which would have required reversal in a criminal case,[14] and that offers to compromise would be treated as they would in a civil matter.[15]

At the same time, a small number of cases did apply rules more associated with criminal procedure. The result in most of these cases, however, was mandated by statute. For example, in *Cady v St Clair Circuit Judge,* 139 Mich 618; 102 NW 1025 (1905), we held that a bastardy defendant could be arrested even though he was immune from civil process. That holding rested upon the fact that the act required that the defendant be arrested and did not permit the use of civil process. Similarly, in *People v Kaminsky,* 73 Mich 637; 41 NW 833 (1889), we found that the police courts had jurisdiction to bind over bastardy defendants. However, that decision was mandated by the court's jurisdictional statute.

The only two cases in which we applied criminal rules to Bastardy Act cases, absent a statutory imperative, were *People v Stoeckl,* 347 Mich 1; 78 NW2d 640 (1956), and *People v McFadden,* 347

---

[8] *Semon v People,* 42 Mich 141, 142; 3 NW 304 (1879).

[9] *In re Cannon,* 47 Mich 481; 11 NW 280 (1882).

[10] *People v Harty,* 49 Mich 490; 13 NW 829 (1882).

[11] *Pangborn v Smith,* 65 Mich 1; 31 NW 599 (1887).

[12] *In re Kaminsky,* 70 Mich 653; 38 NW 659 (1888).

[13] *Harley v Ionia Circuit Judge,* 140 Mich 642; 104 NW 21 (1905).

[14] *People v Oppenheimer,* 170 Mich 595; 136 NW 399 (1912).

[15] *People v Gill,* 247 Mich 479; 226 NW 214 (1929).

Mich 357; 79 NW2d 869 (1956). In the former, we held that it constituted error requiring reversal for the prosecutor to comment on a defendant's refusal to testify. In the latter, we held that a bastardy defendant must give notice of an alibi defense.[16]

In 1956, the Legislature passed the Paternity Act, MCL 722.711 *et seq.;* MSA 25.491 *et seq.,* which in a number of respects decriminalized the procedure governing bastardy cases. Most important, it eliminated the *requirement* of the issuance of an arrest warrant unless the purported father failed to respond to notice by summons. While warrants were still permitted, the court, in its discretion, could use a summons instead of a warrant. MCL 722.714(c); MSA 25.494(c). Even where a warrant was issued, the statute barred the fingerprinting or the photographing of the alleged father, or the listing of his name on any criminal record. MCL 722.714(e); MSA 25.494(e).

The statute also adopted the civil approach to jury trials. Rather than providing for the right to a jury, it instead required that the defendant demand a trial by jury, should he want one. MCL 722.715(a); MSA 25.495(a). In 1966, the statute was amended so as to fully accord with general civil procedure by stating that "[e]ither party may demand a trial by jury." In addition, the Paternity Act eliminated the requirement of a preliminary hearing and required instead that the complaint be verified by oath or affirmation of the complainant. MCL 722.714(c); MSA 25.494(c). Consistent with these provisions for civil procedure, the Paternity Act also included a provision allowing for default in paternity actions. MCL 722.717(a); MSA 25.497(a).

---

[16] *McFadden* was later distinguished in *Skidmore v Czapiga,* 82 Mich App 689; 267 NW2d 150 (1978), in light of a revision in the statute governing notice of alibi defenses.

The Paternity Act also made it possible to sue a defendant residing in Michigan even though the mother and child resided out of state. This change indicates a stronger emphasis on the protection of the mother and child, i.e., private parties to the suit, rather than the state, since no state funds could, in such a setting, have been sought for the support of the child.

In the same vein, while the Bastardy Act had referred to "the defendant," the Paternity Act refers to "the alleged father," and all actions after the passage of the act were taken in the name of the mother rather than the people.

Perhaps in recognition of the fact that a purported father could still face arrest and incarceration under the Paternity Act, the Legislature also provided that he had a right to refuse to testify.

Lastly, the act reflected the technological developments of the times. Blood typing more and more had become a common component of paternity cases, and the act included a provision which gave the purported father the right to request blood typing of the mother and child. This provision reflected our holding in *People v Nichols,* 341 Mich 311; 67 NW2d 230 (1954). In that case, we held that the results of blood testing could be introduced in paternity cases only to prove *nonpaternity.* The use of blood testing to check for the possibility of paternity was only a few years old at that time, and the plaintiff had introduced evidence of nonexclusion. This Court, focusing essentially on the state of the technology, held that evidence of exclusion was admissible, but that evidence of nonexclusion was not, since it "had not the slightest probative value or tendency to prove defendant's paternity." *Id.* at 331. The technology of the day was such that if the defendant was not excluded, he remained in a very large population

of possible fathers. Comment, *Proving paternity by means of serological testing: Should it be admitted as evidence by the courts?*, 1981 Det C L R 47. Pursuant to the Paternity Act, if the mother refused testing, the fact of her refusal would be made known to the jury. MCL 722.716(a); MSA 25.496(a).

The Paternity Act was, in numerous respects, a significant break from its predecessor statute. It introduced the use of a new and often dispositive type of evidence, and, in nearly all respects, it directed the judiciary to apply rules of civil procedure.[17]

Prior to any decisions of record under the new act, the General Court Rules of 1963 were adopted. They contained a special rule, GCR 1963, 730, for paternity cases. GCR 1963, 730.1 stated the general rule of procedure for such cases:

> The procedure in actions under the Paternity Act shall be in accordance with Rule 730, and the general court rules which are not in conflict with the provisions of the Paternity Act.[18]

The adoption of this rule went a long way to resolve arguments as to the nature of the pater-

[17] Shortly after the passage of the Paternity Act, two Attorney General opinions were issued which specifically analyzed its nature. OAG, 1957, No 2883, 160, 162 (April 12, 1957), stated that paternity proceedings "are to be viewed . . . as primarily civil in nature." In a subsequent opinion, the Attorney General stated that it was not necessary for the mother to be examined by the court prior to issuance of the summons and concluded that the "proceedings under the act would be civil proceedings." OAG, 1957, No 3020, 495, 497 (November 1, 1957).

[18] The remaining two subsections of the rule dealt specifically with procedure concerning jury demands and blood testing in paternity cases. GCR 1963, 730.2 originally stated that the alleged father may demand a jury trial. In 1967 this was amended to allow either party to demand a jury, as permitted by the 1966 amendment to the Paternity Act. GCR 1963, 730.3 defined the time limits for requesting blood tests.

nity action. Since its adoption, every Court of Appeals decision has applied the general rules of civil procedure to paternity cases, providing they did not contradict the Paternity Act or Rule 730. The first three decisions of the Court of Appeals clearly reflected this approach. In *Houfek v Shafer,* 7 Mich App 161; 151 NW2d 385 (1967), the Court of Appeals applied the general court rule as to pretrial conferences. In *Romain v Peters,* 9 Mich App 60; 155 NW2d 700 (1967), the Court held that, unlike criminal trials, paternity cases do not require that the jury's verdict be unanimous. In *Butler v Cann,* 62 Mich App 663; 233 NW2d 827 (1975), the Court of Appeals held that a default judgment may be entered against a paternity defendant when he fails to appear for trial.

After these three Court of Appeals decisions, this Court decided the only case in which we have addressed the Paternity Act. In *Artibee v Cheboygan Circuit Judge,* 397 Mich 54; 243 NW2d 248 (1976), we held that Paternity Act defendants have a right to appointed counsel pursuant to the due process provision of the Michigan Constitution, art 1, § 17. The Court observed that

> the interests of the individuals affected are substantial, and the nature of the proceedings is sufficiently complex so as to require counsel to insure a fair trial. [*Id.* at 57.]

Of primary importance to the Court was the fact that, if the mother was unable to afford an attorney, the county would pursue the action for her. We stated that

> [t]he Legislature has expressed its opinion that the complainant and her child would not receive a fair trial without benefit of counsel. The same consider-

ation of fundamental fairness should apply to the
defendant . . . . [*Id.* at 59.]

We also noted that unlike divorce proceedings,
paternity cases involve sharply contested questions
of fact and their purpose is to "determine with
finality the obligation of support, and not
merely . . . an appropriate level of support." *Id.*
at 58. In other words, the Court was concerned
with an indigent purported father's ability to de-
fend himself in a complex matter which would
create financial obligations lasting until the child
attained majority. For example, "[a]n unrepre-
sented paternity defendant . . . may be unaware
of his statutory right to demand blood tests or
unable to analyze the legal implications of the
results." *Id.* The Court also noted the remaining
element of criminal procedure in paternity cases,
i.e., the fact that the purported father could be
arrested rather than served by civil process.[19]

The Court of Appeals has consistently inter-
preted *Artibee* in a narrow manner and correctly
so. The asymmetry of providing an indigent plain-
tiff with an attorney, while denying the same to an
indigent defendant, presents obvious problems of
fundamental fairness. In addition, the importance
of representation by counsel is heightened where

___

[19] The 1986 amendments of the Paternity Act eliminated any
possibility that a paternity defendant will be arrested. At the same
time that it deleted the arrest provision of the Paternity Act, it added
a new provision which states:

The amendatory act which added this subsection shall not be
construed to affect the rights of an indigent defendant in
proceedings under this act as established by decisions of the
courts of this state before the effective date of that amendatory
act. [MCL 722.714(9); MSA 25.494(9).]

The only previously determined judicial protection for an indigent
defendant in a paternity case was the right to counsel defined in
*Artibee.*

the question is one regarding parental and custodial responsibilities. See *Reist v Bay Circuit Judge,* 396 Mich 326; 241 NW2d 55 (1976). It would be erroneous to conclude that the application of this particular and clearly demarcated right was intended to suggest that the full panoply of criminal procedural rights were to be afforded.

This has been recognized by the Court of Appeals which continues to approach paternity cases as essentially civil, and, in accordance with GCR 1963, 730.1, has applied the rules of civil procedure. Indeed, the Court has refused numerous opportunities to extend *Artibee* beyond its facts. In *People v Marshall,* 82 Mich App 92; 266 NW2d 678 (1978), it held that a showing of indigency for purposes of obtaining appointed counsel did not, in and of itself, entitle a defendant to blood testing and a jury trial at county expense. The Court stated that "[w]e cannot say that a paternity action is a 'criminal prosecution' for purposes of the constitutional jury trial guarantee." *Id.* at 96. In *Covington v Cox,* 82 Mich App 644; 267 NW2d 469 (1978), lv den 405 Mich 826 (1979), the Court of Appeals confirmed that view, holding that a defendant must demand a jury. Moreover, the *Covington* panel held that a paternity defendant who receives ineffective assistance of counsel may not seek reversal on that basis. His only remedy in such a case is a malpractice suit. The Court stated:

There are pertinent distinctions between a criminal action and a paternity proceeding that obviate the necessity for vacating an order of filiation granted because of a serious mistake made by defense counsel. First . . . the consequences of such an order are not so severe as to mandate reversal in the interests of the integrity of the judicial system. Second, insofar as the consequences of a filiation and support order are mone-

tary, an action for malpractice provides an adequate remedy for incompetent representation; whereas, such an action obviously would be ineffectual to compensate a wrongfully convicted criminal defendant. [*Id.* at 651.]

Shortly thereafter, another panel of the Court of Appeals held that *Artibee* did not overrule *Semon v People,* 42 Mich 141; 3 NW 304 (1879), which had held that the standard of proof in a paternity case is "preponderance of the evidence." *Huggins v Rahfeldt,* 83 Mich App 740; 269 NW2d 286 (1972).

In the most recent set of cases, the Court of Appeals has carefully adhered to the requirements of the court rules. In *Elmore v Ellis,* 115 Mich App 609; 321 NW2d 744 (1982), the Court of Appeals, finding no contradiction in GCR 1963, 710 or the act itself, applied the civil rule governing witness lists. In *Hoffman v Campbell,* 129 Mich App 114; 341 NW2d 246 (1983), the Court held that a voluntary dismissal of a paternity case did not bar a subsequent action, since GCR 1963, 504.1(2) so provided for civil cases and there was no contradictory provision in GCR 1963, 730 or in the Paternity Act. *Pridemore v Williams,* 90 Mich App 483; 282 NW2d 363 (1979), was the only case in which the Court of Appeals did not apply the relevant rule of civil procedure. However, in that case the panel held that GCR 1963, 309 and 313, which would have required the defendant to answer interrogatories, were contradicted by the Paternity Act provision which permits a paternity defendant to refuse to testify. Indeed, the Court based its conclusion that the act must control on the language of GCR 1963, 730 itself. In that sense, the court rules controlled in even this case.

While the judiciary has continued to stress the primarily civil nature of paternity actions, the

Legislature recently acted to eliminate virtually all remaining vestiges of criminal procedure. In 1986, an amendment was enacted which eliminated all provisions permitting arrest of a paternity defendant or requiring that he post bond prior to trial. Instead, the amendment requires that service be accomplished only by summons "served in the same manner as is provided by court rules for the service of process in civil actions." MCL 722.714(5); MSA 25.494(5). In the Senate Legislative Analysis of the amendments, it is stated:

> The bill goes a long way toward completing changes in the act that were begun in 1956. Though the act at that time was amended to decriminalize the determination of paternity, some of the criminal procedures were retained, leaving the law quasi-criminal. . . . The bill makes it finally clear that paternity is a civil issue. [Senate Bill Analysis, SB 225 (June 20, 1986).][20]

These amendments are consistent as well with the amendment adopted in 1982, which recognized the evolution of blood testing technology. The 1982 amendment provides that blood test results may be introduced, not only to exclude an alleged father from paternity, but also, if he is not excluded, to determine the likelihood that he is, in fact, the father. MCL 722.716(4); MSA 25.496(4). This amendment reflects the development of a technological ability to determine the probability

[20] The two cases now before us both arose prior to the passage of the 1986 amendments, and, therefore, we do not rely upon the amendments for the conclusions that we reach in these cases. However, as the Legislative Analysis of the amendments indicate, reference to the amendments is helpful in achieving a complete understanding of the development of the paternity cause of action. In addition, the defendants in these cases were served by civil process, and, therefore, they were not subjected to the arrest provisions repealed by the 1986 amendments.

of paternity with great precision through blood and tissue typing tests.[21]

In sum, while we recognize that paternity actions are a "special legislative creation," *Artibee* at 68 (COLEMAN, J., dissenting), we conclude that they are fundamentally civil in nature. The aspects of the action which led courts to define it as "quasi-criminal" have consistently been limited since the enactment of the Bastardy Act. Accordingly, procedure in paternity cases is controlled by MCR 3.212, which corresponds to GCR 1963, 730.

With this understanding of the nature of the paternity action, we can move to the cases at bar.

### III

The first question presented in *Bowerman v MacDonald* is what, if any, level of proof, beyond the information contained in a verified complaint, is required prior to an issuance of an order for blood tests.

In reversing the order that defendant submit to a blood test, the Court of Appeals noted that in *Schmerber v California,* 384 US 757; 86 S Ct 1826; 16 L Ed 2d 908 (1966), a drunk driving case, the United States Supreme Court held that a blood test constitutes a search. It then stated:

> Thus, because a blood test is a search which should not be conducted unless justified under the circumstances, we hold that a trial court may not order a blood test until a plaintiff has presented proofs to support the allegations in the complaint. Once a showing of paternity has been presented, a

---

[21] The United States Supreme Court recently observed that "Congress [has] . . . recognized that increasingly sophisticated tests for genetic markers permit the exclusion of over *99%* of those who might be accused of paternity . . . . H.R. Rep No. 98-527, p 38 (1983)." *Clark v Jeter,* 486 US 456, —; 108 S Ct 1910, 1916; 100 L Ed 2d 465 (1988). See also n 7.

blood test is justified because of the great impor-
tance to society that parents care for their chil-
dren.

We wish to reiterate that we are not requiring a
finding of probable cause. A paternity case is only
quasi-criminal, *Artibee v Cheboygan Circuit Judge,*
397 Mich 54, 57; 243 NW2d 248 (1976), and a
defendant is not afforded a full panoply of criminal
procedural protections, *Smith v Robbins,* 91 Mich
App 284, 292; 283 NW2d 725 (1979), *lv den* 408
Mich 853 (1980). For instance, the standard of
proof in a paternity trial is not proof beyond a
reasonable doubt, but rather the lesser burden of
proof by a preponderance of the evidence. There-
fore, because a paternity case is only quasi-crimi-
nal, we decline defendant's invitation to use proba-
ble cause or reasonable grounds as the test. How-
ever, something more than filing a complaint al-
leging paternity is needed when the answer filed
denies paternity. While we are not suggesting
extensive proofs, at least sworn testimony by the
complainant should be considered. [157 Mich App
373-374.]

In essence, the Court of Appeals said that since
the action is quasi-criminal, it requires a showing
of "quasi-probable cause" or "quasi-reasonable-
ness." It did not, beyond requiring sworn testi-
mony from the plaintiff, attempt to define such a
standard. In our view, the Court of Appeals opin-
ion is flawed both in its view of the nature of
paternity cases and in its conclusion that more
than a sworn complaint is required to provide a
sufficient basis for the testing. The paternity case
is essentially a civil case controlled by MCR 3.212,
and therefore there is no reason to define a "quasi-
criminal" requirement of a "quasi-probable cause"
hearing. Moreover, to the degree that a paternity
action is, in fact, a "special legislative creation"
with some vestiges of a criminal action, the re-
quirement that the mother file a sworn complaint

indicating when and where she was impregnated, as well as naming the defendant as the father, is sufficient to provide reasonable grounds to order the tests, and it is therefore unnecessary to hold a hearing.[22]

Consistent with the Court of Appeals approach, defendant argues that the procedure defined by the statute barring driving while intoxicated, MCL 257.625 *et seq.;* MSA 9.2325 *et seq.,* should serve as a model for blood testing procedures in paternity cases. MCL 257.625a(5); MSA 9.2325(1)(5) requires that a police officer have "reasonable grounds" before administering a chemical test and that if the person charged refuses to take the test, it may not be given without court order.

We do not agree that this statute sets forth procedures appropriate to paternity cases. Initially we note that driving under the influence of intoxicating liquor, unlike fathering a child out of wedlock, is a punishable offense. Further, where a police officer stops a driver and seeks to administer a test, it may be that no reasonable grounds for the test exist. The person may have been driving normally. Therefore, once there has been a refusal, the statute requires a court order in order to administer the test. In the paternity setting, the order is *initially* given by a neutral judge, and he already has before him the sworn complaint of plaintiff. Nothing more is necessary to determine the "reasonableness" of the test. The mother has, as required by § 4 of the act, stated under oath or affirmation when and where she became pregnant and that she believes that the defendant is the

---

[22] Where the Michigan Department of Social Services acts as plaintiff, it files its complaints on the basis of information and belief. Therefore, it may be that, where the DSS files the complaint, a sworn statement from the mother indicating where, when, and by whom she became pregnant should be required prior to blood testing. However, that question is not now before us.

father. This, in and of itself, constitutes "probable cause" insofar as such a standard is relevant here.

In a similarly flawed argument, defendant posits that the Fourth Amendment limits the use of blood tests in paternity cases, even if they are considered civil cases, and that the amendment is violated unless a search warrant is obtained or an evidentiary hearing is held prior to issuance of an order. He argues that the blood test in a paternity case implicates the Fourth Amendment since it involves state action, which he finds in the fact that the blood test is ordered by a court pursuant to statute. In his words,

> the Plaintiff-Appellant is requesting the State, through the judicial branch of government, to coerce the Defendant into submitting to the blood test. . . . The Defendant contends that once the State, through its Court system, becomes involved in this process then the Defendant's Fourth Amendment rights . . . is [sic] triggered . . . .

The defendant has not cited, nor has our research revealed, any cases in which otherwise properly constituted discovery in a civil action has been held to constitute a violation of the Fourth Amendment.[23] Assuming, nevertheless, that the Fourth Amendment is implicated, the search involved in the blood testing is, as we just described, a reasonable one. The plaintiff has filed a sworn complaint indicating when and where she became impregnated and her belief that the defendant is the father of her child. The statute accordingly requires that the court, on a motion of either party or on its own motion, order the testing. Such

[23] Indeed, the United States Supreme Court found that the federal rule of civil procedure governing the ordering of blood tests was "free of constitutional difficulty . . . ." *Schlagenhauf v Holder,* 379 US 104, 114; 85 S Ct 234; 13 L Ed 2d 152 (1964).

a complaint clearly places the relationship of the child's and parties' blood and tissue types squarely in controversy and provides good cause for the motion. In addition, the decision to order the testing, i.e., engage in a search, was not made by a law enforcement officer or other nonjudicial officer of the state. It was made by a neutral judge, pursuant to a closely circumscribed statute which focuses upon a particular kind of evidence critical to all parties and perhaps, more importantly, to the child. The Legislature's decision to require the provision of this evidence was based on an obvious rationale, and the requirement was, in this case, triggered by a verified complaint reviewed by a judge. To require a separate probable cause or quasi-probable cause determination would be repetitious, and to require sworn testimony as to information not required to be provided for in the verified complaint would place a burden greater than a showing of probable cause on the plaintiff. In addition, requiring such a hearing would burden the courts without reason and make determinations of paternity, particularly in the case of out-of-state mothers, all the more difficult.

Lastly, the defendant argues that there is a statutory and case law prohibition against using civil discovery in paternity cases. He observes that *Pridemore v Williams, supra,* held that a paternity defendant cannot be required to answer written interrogatories, since he has a statutory right to refuse to testify. Defendant thus argues that *Pridemore* demonstrated that the Paternity Act bars all discovery from a paternity defendant. However, the Paternity Act itself states:

In a proceeding under this act before trial, the court, upon application made by or on behalf of either party, or on its own motion, shall order that the mother, child, and alleged father submit to

blood or tissue typing tests . . . . [MCL 722.716(1); MSA 25.496(1).][24]

In light of this explicit requirement of the Paternity Act, any reliance upon it to limit blood testing is mistaken.

Finding no basis to require more than a sworn complaint upon which to base a blood test order in paternity cases, we reverse the judgment of the Court of Appeals in *Bowerman* and reinstate the trial court order requiring defendant to submit to blood and tissue typing tests.

IV

The remaining question in *Bowerman* is whether defendant may be held in contempt for refusing to submit to a blood test. This question bears a close resemblance to the one raised in *Moon v Ballinger,* in which defendant argues that a court may not enter a default judgment in plaintiff's favor where a paternity defendant refuses blood testing. However, the language of the applicable statutory provisions mandates differing answers to these two questions.

The trial court in *Moon* entered the default judgment in plaintiff's favor pursuant to MCR 2.311 and 2.313. MCR 2.311 is captioned, "Physical and Mental Examination of Persons," and it reads in pertinent part:

(A) Order for Examination. When the mental or physical condition (*including the blood group*) of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental or blood examination . . . . [Emphasis added.]

---

[24] The 1986 amendments of the act left this provision unchanged. However, the amendment reorganized the section, and the provision is now listed as MCL 722.716(1); MSA 25.496(1).

This provision is then referred to in MCR 2.313, which is captioned, "Failure to Provide or to Permit Discovery; Sanctions," and provides in subsection (B)(2):

> *Sanctions by Court in Which Action is Pending.* If a party . . . fails to obey an order to provide or permit discovery, including an order entered under subrule (A) of this rule or under MCR 2.311, the court in which the action is pending may order such sanctions as are just, including, but not limited to the following:
>
> *   *   *
>
> (c) an order striking pleadings or parts of pleadings, staying further proceedings until the order is obeyed, dismissing the action or proceeding or a part of it, *or rendering a judgment by default against the disobedient party.* [Emphasis added.]

The trial court in *Bowerman* held defendant in contempt for refusal to submit to the test pursuant to MCR 2.313(B)(2)(d) which provides that a refusal to submit to discovery provided for in MCR 2.311 may be sanctioned by

> an order treating as a contempt of court the failure to obey an order, except an order to submit to a physical or mental examination.[25]

Ballinger argues that the default sanction may not be used in a paternity case because § 6(a) of the Paternity Act states:

---

[25] In this context, a "physical examination" does not include a blood test. This is apparent from the fact that until 1984 the court rule explicitly listed an order of a blood examination along with mental and physical examinations as an order which could not be enforced by a contempt citation. With the adoption of the Michigan Court Rules in 1985, the reference to blood examinations was deleted, thus allowing contempt to be used as a sanction where a party refuses to take a blood test.

> If the court orders any blood or tissue typing test to be taken and any party refuses to submit to the test, in addition to any other remedies available, the fact of the refusal *shall be disclosed at the trial* unless good cause is shown for not disclosing the fact of refusal. [MCL 722.716(a); MSA 25.496(a).][26]

Plaintiff Moon refers to the same statute, but instead emphasizes the phrase "in addition to any other remedies available," suggesting that while disclosure is mandatory where there is a trial, it does not require that the case actually reach the trial. In other words, plaintiff suggests that where the "other remedy" of default is appropriate, no trial is required.

In our view, the proper interpretation of this statute is made apparent in the contrast between the use of the contempt sanction and the use of the default sanction. Contempt can be applied *in addition* to the disclosure of the refusal at trial. Default, if applied, obviates the need for a trial and cannot therefore be said to be used *in addition* to the disclosure at trial. Unlike the use of the contempt sanction, if a default judgment is entered, the very remedy which the statute mandates cannot be applied. We therefore conclude that while a contempt order may be used to sanction a refusal to submit to a blood test, a default sanction may not.

This conclusion is further supported by reference to another section of the statute.[27] MCL 722.717(a); MSA 25.497(a) states:

---

[26] See n 24.

[27] "[T]he entire act must be read, and the interpretation to be given to a particular word in one section arrived at after due consideration of every other section so as to produce, if possible, a harmonious and consistent enactment as a whole." [*Dussia v*

> If the finding of the court or verdict be against
> the defendant, or if the defendant acknowledges
> paternity orally to the court or by the filing in the
> case of his written acknowledgment of paternity,
> or if he is served with summons or a warrant *and
> a default is duly taken against him,* the court shall
> make an order of filiation declaring paternity and
> for the support and education of the child. [Emphasis added.]

In this section the Legislature listed those events after which an order of filiation may be issued, i.e., a finding or verdict against the defendant, acknowledgment of paternity by the defendant, and a default due to a failure to appear. See *Butler v Cann, supra.* In doing so, the Legislature's events expressed its intention[28] to limit the grounds for a judgment of filiation to only those events listed. Therefore, the Paternity Act conflicts with the Michigan Court Rules insofar as they provide for a default judgment and thus an order of filiation, for failure to submit to a blood test. Indeed, to allow a default judgment to enter would contradict the clear and specific language of the statute.

We therefore vacate the default judgment in *Moon v Ballinger* and remand to the circuit court for proceedings consistent with this opinion.

V

We conclude that a plaintiff mother's verified complaint is sufficient ground upon which to order

---

*Monroe Co Employees,* 386 Mich 244, 248; 197 NW2d 307 (1974) (quoting *Grand Rapids v Crocker,* 219 Mich 178, 182; 189 NW 221 (1922). *State Treasurer v Wilson,* 423 Mich 138; 377 NW2d 703 (1985).]

[28] The words of a statute, however, should not be construed in the void but must be read together to effectuate the intention of the legislature. [*Dussia, supra,* 248.]

blood and tissue tests. Paternity actions are in essence civil actions and procedure in such actions is controlled by the Michigan Court Rules, absent contradiction in the Paternity Act. We therefore also conclude that a defendant father's refusal to submit to such tests may be sanctioned by the use of the contempt power. However, while MCR 2.313(B)(2) provides that a trial court may enter a judgment by default against a party who disobeys a discovery order, in light of a conflicting provision in the Paternity Act, we hold that entry of a default judgment may not be used to sanction a defendant father for refusing to submit to testing.

RILEY, C.J., and LEVIN, CAVANAGH, BOYLE, ARCHER, and GRIFFIN, JJ., concurred with BRICK-LEY, J.