*552
 
 Gage, P.J.
 

 Defendant appeals as of right the trial court’s order setting aside a 1985 settlement agreement and entering a default judgment declaring his paternity of plaintiff’s son. We affirm.
 

 i
 

 FACTS AND PROCEEDINGS
 

 In June 1983, plaintiff filed a complaint in the Kalamazoo Circuit Court alleging that defendant was the father of her minor child, A.S.P., bom May 17, 1983. The court ordered that the parties and child submit to blood tests to determine the child’s paternity. The parties did submit to blood testing and subsequently entered an agreement that required defendant to pay plaintiff $3,500 “in complete and full settlement of any claim that the plaintiff may have against the defendant for the cost of confinement, or the maintenance, support and education of” the child. The agreement specifically provided that defendant did not acknowledge paternity. In February 1985, the circuit court approved the settlement agreement. Defendant ultimately satisfied his end of the bargain, and the court in March 1991 ordered the revocation of an income withholding order that had been entered against defendant.
 

 In September 1996, in the wake of this Court’s decision in
 
 Dones v Thomas,
 
 210 Mich App 674; 534 NW2d 221 (1995), which held that the statutory provision governing settlement agreements in paternity actions was unconstitutional and invalid, plaintiff moved to modify and set aside the parties’ 1985 settlement agreement. Relying on
 
 Dones,
 
 the circuit court set aside the 1985 agreement and again ordered that the parties and the minor submit to paternity
 
 *553
 
 blood testing.
 
 [1]
 
 Defendant then moved that the court reverse its order setting aside the 1985 settlement agreement, arguing that the court should not apply
 
 Dones
 
 retroactively. The court denied defendant’s motion and reordered the blood tests.
 
 [2]
 
 After defendant failed to comply with the court’s order requiring blood tests, plaintiff moved for and the court granted a default judgment of paternity against defendant pursuant to MCL 722.716(l)(a); MSA 25.496(l)(a). The court subsequently entered a default order of filiation requiring that defendant, among other obligations, pay child support of $93 a week commencing on July 18, 1997, without credit for the $3,500 defendant had paid pursuant to the parties’ 1985 settlement agreement.
 

 The parties entered their 1985 settlement agreement, the continuing validity of which represents the core of their instant dispute, pursuant to former § 3 of the Paternity Act, MCL 722.713; MSA 25.493. Section 3 provided as follows:
 

 (a) An agreement or compromise made by the mother or child or by some authorized person on their behalf with the father concerning the support and education of the child
 
 *554
 
 shall be binding upon the mother and the child only when the court having jurisdiction to compel support and education of the child shall have determined that adequate provision is reasonably secured by payment or otherwise and has approved the agreement or compromise.
 

 (b) The performance of the agreement or compromise, when so approved, shall bar other remedies of the mother or child for the support and education of the child.
 

 This Court has adopted different stances regarding the validity of § 3 and has only recently definitively resolved this question. An examination of the history of this Court’s treatment of § 3 is necessary to our informed resolution of the parties’ instant dispute.
 

 n
 

 ANALYSIS AND TREATMENT OF § 3 OF THE PATERNITY ACT
 

 In
 
 Crego v Coleman,
 
 201 Mich App 443; 506 NW2d 568 (1993)
 
 (Crego I),
 
 the plaintiff sought modification of a settlement agreement she and the defendant had entered under § 3.
 
 Id.
 
 at 444-445. The parties’ agreement did not acknowledge the defendant’s paternity and explained that “ ‘it is the intent of the parties that the attached order is not modifiable.’ ”
 
 Id.
 
 at 445. The trial court dismissed the plaintiff’s action on the basis of res judicata.
 
 Id.
 
 at 444. This Court rejected the proposition that the binding effect of a settlement in a paternity action denied an illegitimate child constitutional equal protection rights, reasoning that the illegitimate child’s equal protection rights did not justify increasing an alleged father’s support obligation, while leaving him bound by his agreement to surrender his right to a judicial determination of paternity.
 
 Id.
 
 at 446, citing
 
 Hisaw v Hayes,
 
 133 Mich App 639, 642, 644-645; 350 NW2d 302 (1984). The
 
 Crego I
 
 
 *555
 
 Court concluded that because subsection 3(b) specifically provided that performance of a settlement agreement after court, approval barred “other remedies of the mother or child for the support and education of the child,” the parties were precluded from seeking modification of their agreement absent language within the agreement itself specifically providing for modification.
 
 Crego I, supra
 
 at 447.
 

 This Court again addressed the constitutionality of § 3 in
 
 Dones, supra.
 
 The plaintiff minor, through his next friend, sought modification of a paternity settlement agreement entered by his parents. The defendant had acknowledged paternity and agreed to provide the plaintiff certain sums of money. The plaintiff argued that his right to support could not have been compromised in this settlement, but the trial court granted the defendant summary disposition. On appeal, this Court noted the distinction that while the Paternity Act specifically provides that parties may reach a settlement that bars future recovery or modification of support, the divorce statutes specifically conferred on the court having jurisdiction the power to modify support awards on a showing of a change in circumstance.
 
 [3]
 

 Dones, supra
 
 at 675-676. The Court reasoned that, under the intermediate-level scrutiny with which illegitimacy classifications are examined, the statutory scheme that treated legitimate and illegitimate children differently did not substantially
 
 *556
 
 relate to an important state interest.
 
 Id.
 
 at 677. While the defendant contended that § 3 promoted settlement and finality in paternity proceedings, the Court noted that, in light of recent scientific advances in establishing paternity, the need to settle paternity proceedings had diminished because the danger of inaccurate determinations had been minimized.
 
 Id.
 
 at 678-679. The Court concluded that § 3 was unconstitutional because the need for paternity claim settlement was now the same as the need for settlement of a patemity/support question in a divorce proceeding:
 

 [B]ecause the Legislature has determined in the context of divorce proceedings that the need to allow a modification of child support upon a change in circumstance outweighs the need for settlement and finality, the same conclusion must be applied to paternity actions.
 

 . . . [Section 3] is unconstitutional because it violates equal protection to the extent that it affords the parties to a paternity action greater settlement rights than are afforded parties to a divorce action with respect to the child support issue and to the extent that it renders child support awards under the Paternity Act unmodifiable while child support awards under the divorce statutes remain modifiable.
 
 [Id.
 
 at 679.]
 

 Accordingly, the Court remanded the plaintiffs claim for modification to the trial court.
 
 Id.
 
 at 680. The
 
 Dones
 
 Court failed to address the prior
 
 Crego I
 
 Court’s decision to the contrary.
 

 Following this Court’s
 
 Dones
 
 decision, the Legislature repealed § 3, effective June 1, 1997, noting that this Court had found § 3 unconstitutional. 1996 PA 308; Senate Fiscal Agency Bill Analysis, SB 604, June 24, 1996. Also following
 
 Dones,
 
 the plaintiff from
 
 Crego I
 
 refiled her suit seeking modification of the
 
 *557
 
 settlement agreement she had entered pursuant to § 3. The circuit court granted the plaintiffs motion for modification, concluding that it was bound to follow Dones, the most recent decision addressing the constitutionality of § 3. The defendant appealed.
 
 Crego v Coleman,
 
 226 Mich App 815, 817; 573 NW2d 291 (1997)
 
 (Crego II).
 
 Although the
 
 Crego II
 
 Court indicated its agreement with the
 
 Dones
 
 Court's analysis and conclusion, it reversed the circuit court’s orders on the basis that, pursuant to MCR 7.215(H)(1), both this Court and the circuit court were required to follow
 
 Crego I,
 
 the first post-November 1, 1990, published opinion ruling on the constitutionality of § 3.
 
 Crego II, supra.
 

 A conflict panel of this Court was subsequently convened to resolve the disagreement between the
 
 Crego I
 
 and
 
 Crego II
 
 decisions, and the
 
 Crego II
 
 opinion was vacated. MCR 7.215(H). In
 
 Crego v Coleman,
 
 232 Mich App 284; 591 NW2d 277 (1998)
 
 (Crego III),
 
 the majority agreed with the analysis of the
 
 Crego II
 
 Court that determined § 3 unconstitutionally violated equal protection guarantees.
 
 Crego III, supra
 
 at 288. The
 
 Crego III
 
 Court reiterated that while all children have an inherent right to parental support, § 3 denied children bom outside marriage who are not the subject of a filiation order the right to seek modification of support orders, a right expressly granted to other children.
 
 Crego III, supra
 
 at 290-292. In light of “ ‘the announced public policy of this state ... to treat children bom out of wedlock as no less deserving of support than those bom in wedlock,’ ”
 
 id.
 
 at 294, quoting
 
 Smith v Robbins,
 
 91 Mich App 284, 289; 283 NW2d 725 (1979), the
 
 Crego III
 
 Court found no difference between the state’s interest in settlement and finality
 
 *558
 
 in divorce proceedings and those same interests in actions under the Paternity Act that would justify treating children bom outside marriage differently than children generally.
 
 [4]
 

 Crego III, supra
 
 at 294-295. Therefore, the Court concluded that § 3 was not substantially related to the achievement of any important governmental objective.
 
 Crego III, supra
 
 at 293-295.
 

 Having reviewed the pertinent legal history concerning § 3, we may now proceed to address the parties’ arguments on appeal.
 

 in
 

 Defendant first contends that the trial court erred in relying on
 
 Dones, supra,
 
 as the basis for setting aside the parties’ 1985 settlement agreement.
 
 [5]
 
 The
 
 *559
 
 trial court granted plaintiffs motion to set aside the settlement agreement on September 3, 1996. At that time, § 3 was still in effect, and
 
 Crego I
 
 and
 
 Dones
 
 stood in unreconciled contradiction. The point is insignificant, however, given that
 
 Crego III
 
 has overruled
 
 Crego I
 
 and held that § 3 was unconstitutional, thus nullifying the precedent defendant argues should have controlled. Therefore, the ultimate question becomes whether this Court’s holding in
 
 Crego III
 
 may be applied retroactively.
 

 IV
 

 Defendant next argues that this Court’s decision in
 
 Dones
 
 should not be applied retroactively.
 
 Crego III
 
 was released after defendant had filed this appeal and therefore fails to appear within either party’s brief on appeal. Because the reasoning and holdings of
 
 Dones
 
 and
 
 Crego III
 
 are essentially the same, however, we will simply extend the parties’ arguments regarding
 
 Dones
 
 to address the
 
 Crego III
 
 decision. The retroactive effect of this Court’s
 
 Crego III
 
 decision is a question of law, which this Court reviews de novo.
 
 Oakland Co Bd of Co Rd Comm’rs v Michigan Property
 
 
 *560
 
 <6
 
 Casualty Guaranty Ass’n,
 
 456 Mich 590, 610; 575 NW2d 751 (1998).
 

 We begin our analysis by restating the well-settled general rule that unconstitutional statutes are void ab initio. In
 
 Stanton v Lloyd Hammond Produce Farms,
 
 400 Mich 135; 253 NW2d 114 (1977), our Supreme Court explained this proposition as follows:
 

 “The general rule is that an unconstitutional statute, though having the form and name of law, is in reality no law, but is wholly void, and ineffective for any purpose; since unconstitutionality dates from the time of its enactment, and not merely from the date of the decision so branding it, an unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed.”
 
 [Id.
 
 at 144-145, quoting 16 Am Jur 2d, Constitutional Law, § 177, pp 402-403.]
 

 The unconstitutional statute “leaves the question that it purports to settle just as it would be had the statute not been enacted.” 16A Am Jur 2d, Constitutional Law, § 203, p 90.
 

 Another general rule is that judicial decisions are to be given full retroactive effect.
 
 Michigan Educational Employees Mut Ins Co v Morris,
 
 460 Mich 180, 189; 596 NW2d 142 (1999);
 
 Lindsey v Harper Hosp,
 
 455 Mich 56, 68; 564 NW2d 861 (1997). As the Court in
 
 Stanton, supra
 
 at 147, also recognized, however, judicial decisions finding statutes unconstitutional will not be applied retroactively without concern for justice and equitable treatment. Where injustice might result from full retroactivity, courts have adopted a more flexible approach, giving holdings limited retroactive or prospective effect.
 
 Lindsey, supra.
 
 In deciding to what extent to apply retroactively a changed legal interpretation of a statute, we must consider the following elements: (1) the purpose to be served by
 
 *561
 
 the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice.
 
 Morris, supra
 
 at 1090;
 
 Lincoln v General Motors Corp,
 
 231 Mich App 262, 268; 586 NW2d 241 (1998);
 
 Jahner v Dep’t of Corrections,
 
 197 Mich App 111, 114; 495 NW2d 168 (1992). We may also incorporate into our analysis any other facts or considerations relevant to the instant dispute that may affect the fairness of our determination.
 
 Stanton, supra
 
 at 147. See also
 
 Morris, supra
 
 at 190 (“resolution of the retrospective-prospective issue ultimately turns on considerations of fairness and public policy”) (citation omitted);
 
 Sellers v Hauch,
 
 183 Mich App 1, 11-12; 454 NW2d 150 (1990) (The overriding goals in determining whether to apply retroactively a new rule of law are to effectuate fairness and public policy.). No specific factor will control, nor will any particular result necessarily prevail from decision to decision.
 

 “It is evident that there is no single rule of thumb which can be used to accomplish the maximum of justice in each varying set of circumstances. The involvement of vested property rights, the magnitude of the impact of decision on public bodies taken without warning or a showing of substantial reliance on the old rule may influence the result.”
 

 The benefit of flexibility in opinion application is evident. If a court were absolutely bound by the traditional rule of retroactive application, it would be severely hampered in its ability to make needed changes in the law because of the chaos that could result in regard to prior enforcement under that law. . . . Without the flexibility to so apply the decision, it would be unlikely that much needed change could be effectuated in this state.
 
 [Placek v Sterling Heights,
 
 405 Mich 638, 665; 275 NW2d 511 (1979).]
 

 In applying these considerations to the instant case, we first examine the purpose of the new rule
 
 *562
 
 announced in
 
 Crego III.
 
 The
 
 Crego III
 
 Court, which convened to settle the conflicting reasoning of the
 
 Crego I
 
 and
 
 Crego II
 
 (and by implication the Dones) decisions, clearly intended to remove the statutory bar preventing illegitimate children not subject to an order of filiation from potentially modifying purportedly final § 3 support agreements,
 
 Crego III, supra
 
 at 291-292, thus securing for these illegitimate children the same rights to parental support as legitimate children receiving support under divorce settlement agreements.
 
 Id.
 
 at 294-295.
 

 Children bom outside marriage are no less deserving of support because of the circumstances of their birth than other children. If there is no limitation on the right of a legitimate child to seek modification of support, then there can be no such limitation on the same right for a child bom outside marriage.
 
 [Id.
 
 at 296.]
 

 Our determination to apply
 
 Crego III
 
 as fully retroactive would best enable achievement of this purpose.
 

 We next consider the extent to which defendant may have behaved in reliance on the unconstitutional § 3. Defendant maintains generally that pursuant to the parties’ 1985 agreement, he possessed a vested contractual right with which a subsequent court decision should not interfere. Although defendant fails to explain specifically what concrete, vested right he obtained pursuant to the parties’ agreement, we acknowledge that the existence of potentially affected vested rights is a legitimate consideration that may weigh against retroactively applying a decision or statute.
 
 Placek, supra
 
 at 665;
 
 Martin v White Pine Copper Co,
 
 378 Mich 37, 44; 142 NW2d 681 (1966);
 
 Donohue v Russell,
 
 264 Mich 217, 219; 249 NW 830 (1933). While defendant also argues that he would have made different financial decisions over the past
 
 *563
 
 several years if he had known the parties’ 1985 settlement agreement was subject to modification, and that in reliance on the settlement agreement he broke all emotional bonds with the minor, he offers no evidence of any specific examples of his alleged reliance in either the record or in his brief on appeal. In any event, as discussed below, defendant’s claims of financial reliance on the old settlement agreement are insufficient to outweigh his son’s right to financial support.
 

 Next requiring analysis is the question whether retroactive application of
 
 Crego III
 
 would adversely affect the administration of justice. Defendant suggests only that the full retroactive application of
 
 Dones
 
 and
 
 Crego III
 
 would cause chaos in the judicial system. Because defendant lacked the benefit of the decision in
 
 Crego
 
 III.when he filed his brief on appeal, we will also consider on his behalf the
 
 Crego III
 
 dissent’s contentions regarding retroactivity. The dissent first noted that literally thousands of cases must have been initiated under § 3 since its 1956 enactment.
 
 Crego III, supra
 
 at 327. The dissent feared that the majority’s decision would permit putative fathers to commence actions independently to revisit settlement agreements in attempts to disprove their paternity.
 
 Id.
 
 at 328, n 26. The dissent speculated with apparent trepidation that, “if the putative father, using modem dna testing methods, is now ‘cleared’ of patemity[,] [w]ill such an individual be able to obtain reimbursement of the total amount of child support he paid for a child bom outside marriage from the mother of that child?”
 
 Id.
 
 at 328. According to the dissent, this type of restitution could impose on the mother a tremendous financial hardship.
 
 Id.
 
 Finally,
 
 *564
 
 the dissent wondered whether, “[i]f in a significant number of these cases the men involved are now able to disprove paternity and renounce those agreements, will the children bom outside marriage be henceforward deprived of any ‘parental’ child payments whatsoever?”
 
 Id.
 
 at 329.
 

 While we admittedly may not predict with certainty the actions of different parties to settlement agreements that must have been entered under vastly differing circumstances, a retroactive application of the
 
 Crego III
 
 decision would not necessarily facilitate any of these imagined developments. We initially note that children generally lose their entitlement to parental support at the age of eighteen, MCL 722.1(a), 722.3; MSA 25.244(1)(a), 25.244(3); MCR 3.211(E)(2), or perhaps at the age of nineteen years and six months. MCL 722.3a; MSA 25.244(3a). Therefore, because it is the minor child’s right to and need for support that is primarily at issue and because a completely retroactive application of
 
 Crego III
 
 to every nonmodifiable § 3 support agreement entered since the enactment of § 3 in 1956 would likely adversely affect the administration of justice, we would limit the retroactive application of
 
 Crego III
 
 to settlement agreements entered before the Legislature’s repeal of § 3, effective June 1, 1997, the subjects of which have not yet reached the age at which their right to parental support terminates.
 

 As a practical matter, the potential litigation is further limited to situations where the potential litigant is dissatisfied with the agreement’s support provisions, has knowledge of the putative father’s continued existence and location, and believes that seeking modification of the agreement would constitute a
 
 *565
 
 worthwhile endeavor. Presumably, some potential litigants appreciate the finality their settlement agreements have provided and would have no desire to reinitiate contact with the putative father. We may reasonably assume that many cases also exist involving putative fathers without savings and with little earning potential and that, therefore, no incentive to revisit the previously entered settlement agreement would exist. In sum, while retroactive application of
 
 Crego III
 
 would remove a legal obstacle preventing revisitation of this discrete class of settlement agreements, we find it likely that various practical realities would discourage relitigation of all these potentially modifiable agreements.
 

 Regarding the
 
 Crego III
 
 dissent’s concerns with respect to putative fathers seeking to reopen settlement agreements in attempts to disprove paternity, it does not ineluctably follow from
 
 Crego III
 
 or our decision today that putative fathers have that right. We express no opinion on that issue and leave it to a case raising the question.
 

 As the final consideration in our retroactivity analysis, we must not forget that the illegitimate child’s right to support is primarily at issue.
 
 Crego III, supra
 
 at 294, n 5. In
 
 Evink v Evink,
 
 214 Mich App 172, 175-176; 542 NW2d 328 (1995), we held that
 

 [a] child has an inherent right to parental support. ... As this Court has stated, the purpose of child support is to meet the needs of the child, and the parents may not bargain away a child’s right to receive adequate support. . . .
 

 To accept defendant’s position would be to allow a parent to voluntarily release parental rights in order to escape the child support obligation where the child remains in the custody of the other biological parent. Such a result is not supported by statute, case law, or sound public policy. We hold
 
 *566
 
 that in the absence of a clear legislative directive stating otherwise, where a biological parent voluntarily releases parental rights to the children and custody remains with the other biological parent, the termination of parental rights does not terminate the parent’s obligation to support the child.
 

 See also
 
 Crego III, supra
 
 at 290 (citing
 
 Evink
 
 for the proposition that children have an inherent right to parental support). Only a child’s adoption relieves the child’s natural parents from their obligation to support the child.
 
 Evink, supra
 
 at 174. Furthermore, as the Court recognized in
 
 Crego III, supra
 
 at 295, illegitimate children have the same needs for support as other children.
 
 Smith, supra.
 
 As this Court concluded in
 
 Crego III, supra
 
 at 296-297,
 
 Crego II, supra
 
 at 818-821, and
 
 Dones, supra
 
 at 676-679, denying plaintiff’s son the opportunity to seek additional support constituted a denial of equal protection. See
 
 Stanton, supra
 
 at 146-148 (The Supreme Court in
 
 Stanton
 
 retroactively applied another Supreme Court decision that held unconstitutional a statutory provision that prevented certain agricultural employees from receiving worker’s compensation on the basis that the statute denied these employees equal protection, and despite the defendants’ arguments that they had relied financially on the unconstitutional statute.). We also acknowledge the state’s interest in providing for the support and care of illegitimate children,
 
 Crego III, supra
 
 at 294, which interest is reflected in the announced public policy of this state to treat children bom out of wedlock as no less deserving of support than those bom in wedlock.
 
 Smith, supra
 
 at 289. Although defendant enjoys a vested contractual right that formed under § 3, as a matter of public policy, the overriding interest of the illegitimate child must
 
 *567
 
 prevail when defendant’s contractual right conflicts with the child’s right to support, especially when the child’s right to support is considered in conjunction with the state’s interest in providing for these children. As the trial court in this case astutely observed:
 

 Because really what’s at issue here, it seems to me, is a constitutional right of the child as much as it is the constitutional rights of the parents and we can’t lose sight of that fact. It’s a child who is—who has apparently, I believe, been unrepresented throughout all of these proceedings, including even right now.
 

 So I think it’s even more incumbent upon us to recognize that the rights of the child are at issue here and must be balanced. And you’ve got constitutional rights. The
 
 Dones
 
 case is based on equal protection, which basically found that the child was denied equal protection under the paternity law that the
 
 Dones
 
 case overturned.
 

 And so what we are talking about here is a child’s right to be supported and to have equal protection to support that has to be balanced against the rights of the defendant.
 

 ... I think it’s important to look at the first of the factors, that is the purpose of the new rule, very carefully. And I’m satisfied that it weighs heavily in favor of the decision that I am giving, and that is as the purpose of this rule is to assure equal protection for children. And balancing that right against the defendant’s right to due process, I believe . . . the child has to be protected. And that purpose has to weigh heavily in favor of protecting the child.
 

 V
 

 Defendant next argues that the trial court applied the wrong law when it entered a default judgment of paternity for defendant’s failure to obey the court’s order for blood tests. The determination whether a statutory provision applies to a given action is purely a legal question that this Court reviews de novo.
 
 Auto
 
 
 *568
 

 Club Ins Ass’n v State Farm Ins Cos,
 
 221 Mich App 154, 169; 561 NW2d 445 (1997).
 

 Plaintiff initially filed her paternity action in 1983. At that time subsection 6(a) of the Paternity Act, MCL 722.716(a); MSA 25.496(a) provided as follows:
 

 “If the court orders any blood or tissue typing test to be taken and any party refuses to submit to the test, in addition to any other remedies available, the fact of the refusal shall be disclosed at the trial unless good cause is shown for not disclosing the fact of refusal.”
 
 [Bowerman v MacDonald,
 
 431 Mich 1, 22-23; 427 NW2d 477 (1988).]
 

 In
 
 Bowerman,
 
 the Supreme Court concluded that a default judgment in favor of a plaintiff mother in a paternity case could not be entered as a sanction for the defendant’s refusal to submit to a blood test.
 
 Id.
 
 at 3-4, 22-24. Defendant’s argument that the trial court should have applied this law ignores that by the time the trial court set aside the parties’ 1985 settlement agreement and ordered blood tests (in 1996 and 1997), and at the time of defendant’s subsequent refusals to comply, the Legislature had amended subsection 6(a), now 6(1), to specifically permit the trial court to enter a default for defendant’s refusal. Subsection 6(1) currently provides in relevant part as follows:
 

 If the court orders a blood or tissue typing or dna profile determination to be conducted and a party refuses to submit to the typing or dna profile determination, in addition to any other remedies available, the court may do either of the following:
 

 (a) Enter a default judgment at the request of the appropriate party.
 

 
 *569
 
 (b) If a trial is held, allow the disclosure of the fact of the refusal unless good cause is shown for not disclosing the fact of refusal. [MCL 722.716(1); MSA 25.496(1).]
 

 Because the statute in effect at the time defendant disobeyed the trial court’s order specifically contemplated the trial court’s entry of a default against him, defendant’s argument that the trial court improperly applied subsection 6(1) retroactively is without merit.
 

 VI
 

 Lastly, defendant asserts that the trial court erred in imposing the harshest of sanctions for his failure to comply with the blood test order. We review the trial court’s discretionary decision whether to enter a default judgment for an abuse of that discretion.
 

 In reviewing a trial court’s discretionary entry of a default judgment, this Court has considered the following factors:
 

 “]W]hether the [party’s] failure to respond to discovery requests extends over a substantial period of time, whether an existing discovery order was violated, the amount of time that has elapsed between the violation and the motion for a default judgment, the prejudice to [the party requesting default], and whether wilfulness has been shown.”
 
 [Traxler v Ford Motor Co,
 
 227 Mich App 276, 286; 576 NW2d 398 (1998) (citation omitted).]
 

 Applying this set of standards to the instant case weighs against defendant’s argument that the default judgment was improper. While defendant argues that the time between the trial court’s ordering of the blood tests and its entry of the default judgment (August 1, 1997, through September 29, 1997) was relatively short, presumably to show that he had not stalled discovery for an extended period and that not
 
 *570
 
 much time had elapsed between his violation of the court’s order and plaintiff’s motion for default, we note that defendant apparently twice disobeyed the court’s orders for blood tests. On September 18, 1996, the court ordered that defendant appear for testing on October 9, 1996, at a specified place and time. Defendant never appeared and did not move to set aside the court’s order for blood tests until June 4, 1997. After the court denied defendant’s motion and on August 1, 1997, ordered that defendant appear for testing on August 13, 1997, defendant again ignored the court’s order. Given these circumstances, a significant amount of time elapsed during which defendant failed to respond to the court’s orders, and plaintiff’s August 18, 1997, motion for default was not premature. With respect to the prejudice to plaintiff that resulted from defendant’s refusals to comply with the court orders, we note that defendant’s refusals denied plaintiff access to potentially the most probative evidence obtainable of defendant’s paternity of the child. Regarding the nature of defendant’s failure to comply, defendant’s refusals were blatantly wilful. Defendant was unquestionably aware of the consequences of refusing to submit to blood testing, having been forewarned by the trial court at the July 18, 1997, hearing regarding defendant’s motions to set aside the court’s previous orders that “[i]f that blood test is not taken, the consequences provided for in the statute would, of course, result.” Furthermore, at the September 29, 1997, hearing regarding plaintiff’s motion for a default judgment, defendant showed no indication that he would ever submit to the blood tests. Accordingly, we cannot conclude that the trial court abused its discre
 
 *571
 
 tion in entering a default judgment of paternity against defendant.
 

 Defendant, an African-American, maintains, however, that he should nonetheless remain free to ignore the court’s blood testing orders because plaintiff, a Caucasian, had sexual intercourse with two other African-American men before her biracial son’s birth. According to defendant, in light of the fact that MCL 722.716(5); MSA 25.496(5) contemplates that more than one person may have a paternity probability of ninety-nine percent or above, his refusal to comply with the court’s blood test orders did not represent wilful behavior because he “had to protect his right against the presumption of paternity when he was only one of at least three possible men who could have been the father of the child in the present matter.” Defendant moved before the trial court for an order requiring that these two men also appear for blood tests, and the trial court denied this motion. We fail to understand, however, the extent to which defendant’s concerns are relevant to our determination whether defendant should have obeyed the trial court’s orders. Defendant cites no authority for his position that the trial court’s failure to order the additional tests excuses his twice ignoring the trial court’s orders to submit himself for testing, or for the proposition that the trial court erred in denying his motion to order the testing of other men. Defendant should have submitted himself for testing and sought rehearing of or appealed the trial court’s denial of his motion to have the other men tested. However, defendant has chosen not to appeal that order, electing instead to attempt to utilize it as a basis for overturning the default judgment. Defendant’s argument
 
 *572
 
 does not affect our conclusion that the trial court properly entered a default judgment against defendant.
 

 vn
 

 In summary, our decision regarding retroactivity generally applies to illegitimate minor children not subject to orders of filiation who are parties to purportedly nonmodifiable § 3 settlement agreements, permitting these minors to seek modification of their settlement agreements. Our decision does not apply to individuals who no longer are entitled to parental support. MCL 722.1(a), 722.3; MSA 25.244(1)(a), 25.244(3); MCR 3.211(E)(2).
 

 In this specific case, we reject defendant’s various assertions that the trial court erred in setting aside the parties’ § 3 settlement agreement, and we conclude that the court properly entered a default judgment of paternity against defendant.
 

 Affirmed.
 

 [1]
 

 Although the court’s order does not specifically mandate dna testing, the court explained on the record at a July 18, 1997, hearing that dna testing would benefit all the interested parties:
 

 In this case there is a new technology that is available since the prior blood test; namely, dna testing. The availability of newer technology benefits all parties so as to increase the certainty of the outcome of the testing, not just the child, not just the plaintiff, but also the defendant. Therefore, it is logical and appropriate that there be another blood test ordered.
 

 [2]
 

 The court also denied defendant’s motion to order that two other men with whom plaintiff admitted having had sex in 1982 also submit to blood testing.
 

 [3]
 

 The Court cited MCL 552.17(1); MSA 25.97(1), which states that
 

 [t]he court may, from time to time after its issuance, on the petition of either of the parents, revise and alter a judgment concerning the care, custody, maintenance, and support of some or all of the children, as the circumstances of the parents, and the benefit of the children require.
 

 [4]
 

 Like the
 
 Dones
 
 and
 
 Crego II
 
 Courts, the Court in
 
 Crego III, supra
 
 at 296, noted that the factual determination of paternity is no longer a difficult credibility contest given scientific advances in dna testing that provide a more convenient and more accurate method for establishing paternity.
 

 [5]
 

 Plaintiff claims that defendant has failed to preserve for our review the issue whether
 
 Dones
 
 or
 
 Crego I
 
 represented the controlling precedent because defendant failed to raise any argument to this effect before the trial court. While plaintiff correctly notes that defendant failed to specifically argue before the trial court that
 
 Crego I
 
 should control the trial court’s decision, we may nonetheless consider defendant’s argument because it raises a question of law and any facts necessary to a proper resolution of this issue have been presented.
 
 Poch v Anderson,
 
 229 Mich App 40, 52; 580 NW2d 456 (1998).
 

 Plaintiff also maintains that this Court has no jurisdiction to address defendant’s arguments concerning the propriety of the trial court’s decision to set aside the parties’ 1985 settlement agreement because defendant failed to timely file his claim of appeal. According to plaintiff, the trial court’s August 1, 1997, order denying defendant’s motion to set aside the court’s September 1, 1996, order setting aside the 1985 settlement agreement constituted a final order with respect to any issues involving the validity of the parties’ settlement agreement, and MCR 7.203(A)(1) and 7.204(A)(1) therefore required that defendant file his claim of appeal within twenty-one days of August 1, 1997. Defendant filed the instant claim of appeal on November 4, 1997. Plaintiff’s argument, however, mis
 
 *559
 
 apprehends the concept of a “final order” or “final judgment.” A final judgment or order in a civil case means “ ‘the first judgment or order that disposes of all the claims and adjudicates the rights and liabilities of all the parties, including such an order entered after reversal of an earlier final judgment or order.’ ”
 
 Baitinger v Brisson,
 
 230 Mich App 112, 116; 583 NW2d 481 (1998), quoting MCR 7.202(8)(a)(i). The trial court’s order setting aside the parties’ 1985 settlement agreement did not represent a final order or judgment because it left unresolved the parties’ rights and liabilities. The issues arising from the trial court’s order setting aside the prior settlement agreement could properly be appealed as of right only on entry of the trial court’s final order, which occurred on November 3, 1997, when the court established defendant’s specific support obligations. Therefore, defendant timely filed his claim of appeal on November 4, 1997, and we have jurisdiction to address his arguments.