*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

TAMMY LEE MARTIN,

    Plaintiff-Appellant,

v

JEFFREY ALLAN MARTIN,

    Defendant-Appellee.

FOR PUBLICATION
January 28, 2020
9:05 a.m.

No. 349261
Ottawa Circuit Court
LC No. 10-068039-DM

Before: MARKEY, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

Since at least 2010, plaintiff Tammy Lee Martin has denigrated her now ex-husband, defendant Jeffrey Allan Martin, to their three children. Jeffrey was not blameless, and the trial court found in 2012 that he was controlling and misused corporal punishment in times of anger. During a four-year period during which Tammy effectively prevented any parenting time, Jeffrey engaged in extensive counseling and showed marked improvement. Even so, Tammy continued to obstruct her children's counseling and parent-child reunification efforts, adding to the strain on Jeffrey's relationship with his children. In 2019, after several attempted less drastic measures failed, the court awarded Jeffrey sole physical and legal custody of the couple's only remaining minor child and prohibited Tammy any unsupervised contact. The circuit court thoroughly explained its findings and actions on the record, did not reach its final order lightly, and anticipated that Tammy may regain unsupervised parenting time. We discern no error in the circuit court's conclusion that awarding Jeffrey sole custody and preserving that parent-child relationship was in the child's best interest. We affirm.

## I. BACKGROUND

Tammy and Jeffrey Martin married in 1995. The couple had two sons, who are now both adults—AM1 and MM—and a daughter—AM2—who will soon be 17. The marriage was rife with conflict and Tammy filed for divorce in 2010. Custody of the children, who were then all minors, was hotly contested. Evidence supported that Jeffrey had emotionally abused the family and had used improper physical punishment against his sons; also supported was that Tammy worked to alienate her children from their father. From 2010 until the 2012 divorce trial,

-1-

parenting time was strained at best. Tammy often violated the court's parenting-time orders. Parenting time was eventually moved to sessions supervised by a therapist or social worker, further revealing a pattern of interference by Tammy.

Following extensive discovery and counseling, the court held a seven-day trial in 2012, after which it awarded sole legal and physical custody to Tammy. The court ordered therapeutic supervised parenting time to ease the reunification of the children with Jeffrey. Of import to this appeal, in rendering its custody and parenting-time orders, the court found that *both parents* had engaged in some type of "abuse." Here is a sample of the court's findings:

> Since their separation, [Jeffrey] has experienced significantly increased estrangement from his children. [Tammy] has used offensive and inappropriate language when talking to or about [Jeffrey] in the children's presence, and the children have all witnessed some degree of domestic violence in the home. As a result, it is clear that they have avoided exercising parenting time with their father . . . . The Court concludes that [Tammy] has engaged in conduct intended to alienate the children from their father, but the estrangement that [Jeffrey] has experienced can also be explained by his own language and conduct.

> \* \* \*

> The relationship between the parties is one of chronic and constant conflict. This has affected both of their capacities to give the children love, affection, and guidance. [Jeffrey's] guidance has been strict, too often angry, and sometimes vindictive. [Tammy's] guidance has been more permissive, and often asserted in reaction and opposition to her husband. . . .

> As the marital conflict increased, [Tammy's] opposition to [Jeffrey's] aggressive and rigid attempts to provide guidance has become more overt and destructive. She has told [Jeffrey] in the children's presence that they can call him names and treat him disrespectfully because "he deserves it." [Jeffrey's] capacity to provide guidance has been badly damaged, partially by his own anger and control issues, and just as significantly by [Tammy's] actions and statements. . . .

> \* \* \*

> [Jeffrey] has engaged in verbal abuse and some physical abuse directed toward his wife and the children, and [Tammy] has exposed the children to her ongoing verbal abuse about or directed toward her husband. . . .

> \* \* \*

> [Tammy] and the children have been subject to [Jeffrey's] verbal and emotional abuse, and the testimony and evidence support a finding that he used his anger and emotional abuse as tools of control against both [Tammy] and the children. . . . Although the court agrees that the evidence of physical violence is

-2-

sparse, [Jeffrey's] use of anger and intimidation has been frequent, and disciplining children by the use of corporal punishment, in anger, as [Jeffrey] has often done, makes it very difficult to distinguish from abuse. It is the first and primary cause of his estrangement from the children.

Despite the family difficulties, the therapists involved all believed that the father-child relationship could and should be restored through therapeutic parenting-time sessions. The court agreed. The court therefore ordered parenting-time sessions supervised by social worker Todd Monroe, who had been selected by Tammy to counsel the children. Unbeknownst to the court, however, Monroe had recently resigned as the children's counselor. Monroe later advised the court that the "process [was] no longer therapeutically effective" because of Tammy's lack of cooperation and the children's defiant and unwilling attitudes. As a result, Jeffrey was denied his court-ordered parenting time. Jeffrey sought court intervention, but on August 23, 2012, the court inexplicably entered an order denying Jeffrey's request for relief because the court had "no alternate parenting time plan" available.

For the next four years, Jeffrey had no parenting time with the children. He voluntarily engaged in counseling and parenting classes to improve his anger management issues and parenting skills. Jeffrey sometimes attended the children's sports and school events in order to see them, but Tammy and the children responded by withdrawing from extracurriculars and accused Jeffrey of "stalking" them. In February 2016, Jeffrey again approached the court to enforce its parenting-time orders.

Following a Friend of the Court (FOC) investigation, the trial court implemented a parenting-time plan that required the two remaining minor children, MM and AM2, to work with a reunification therapist, Amy Van Gunst. The court ordered Tammy to work with a therapist, Merrill Graham, "regarding her alienating behaviors, as identified in the [FOC] report." The court required Jeffrey to continue counseling with Al Heysteck, and provided that MM and AM2 would see a therapist, Lesley Menhart. Jeffrey's parenting time was then to be supervised by a therapist. Menhart's early reports focused on the impacts of abuse and described that MM and AM2 suffered from anxiety and depression, that MM's psychological conditions had caused digestive and abdominal issues, and that a therapist would require extensive time to build a relationship with AM2 given her shyness and unwillingness to speak. Over a span of several months, however, the evidence increasingly showed that Tammy was undermining the reunification efforts. Graham reported, "In attempting to understand the rationale behind [Tammy's] concerns, it was not sufficiently clear that there is [a] basis for an ongoing refusal to support the child-father attachment."

Tammy delayed in arranging appointments with Van Gunst, which led to additional delay in Jeffrey seeing the children. Then, in a July 2017 report, Van Gunst stated that Tammy was "rewrit[ing] history" for her children and convinced them that Jeffrey was "a monster." Tammy's alienation was "psychologically very dangerous" for the children and would have "[l]ong-term effects" on their future relationships. Around the same time, Menhart reported:

[O]n 3-2-17 and 3-27-17[,] [Tammy] was clear in front of the children, as well as privately with this therapist, that she continues to believe the children are in extreme danger if they were to be around [Jeffrey], that [Jeffrey] is trying to see

-3-

the children only to control her and the children (not because he loves or cares about them), that [Jeffrey] is the cause of the children's physical and emotional issues, that [Jeffrey] has made no positive changes in his life and that this therapist has deceived and failed the children by supporting the process of reunification. During these discussions, [Tammy] was extremely upset, anxious and angry, with loud, pressured speech. When this therapist attempted to provide more recent facts (for example, that [Jeffrey] has not seen the children in 4+ years, therefore maybe the children's anxiety and depression has another source)[,] [Tammy's] anger escalated.

Based on the evidence gathered during counseling and Tammy's failure to comply with scheduling and attending appointments for her and the children, the court held Tammy in contempt on October 5, 2017, and imposed a jail sentence. After considering the best-interest factors of MCL 722.23 at length, the court adopted a new parenting-time plan that included extended periods of uninterrupted make-up parenting time for Jeffrey.

Despite the ongoing problems, the parties reached a stipulated order on April 3, 2018, for shared legal and physical custody of MM and AM2. The parties agreed to several provisions governing parenting time and other matters, and agreed to a step schedule of increasing parenting time for Jeffrey. But this agreement was short lived. During Jeffrey's parenting time, MM surreptitiously disseminated information gleaned from Jeffrey's and his then-girlfriend's, now wife's, iPads to the child's maternal aunt and both children made parenting time with their father difficult and stressful. On May 4, 2018, the court eliminated Tammy's midweek visits with the children during Jeffrey's parenting time as well Tammy's right to an extended period of parenting time that summer. The court also ordered "specific behavioral modification therapy" for Tammy.

On June 13, 2018, the parties reached a new stipulated order under which AM2 would live primarily with Jeffrey and Tammy would have parenting time only on alternating weekends. To limit the effect on AM2 of MM's more overt defiance to reunification, Jeffrey abandoned his right to parenting time with his son. The parties agreed that MM required permission to visit Jeffrey's home and to have contact with his sister during Jeffrey's parenting time. Therapeutic reunification efforts with MM also ceased. MM apparently did not react well when Jeffrey informed him of the stipulated order that evening. After MM called his mother's attorney and 911, police convinced MM to leave Jeffrey's home. AM2 threatened to commit suicide if MM left and so was transported to the hospital.

On December 10, 2018, Jeffrey moved for sole physical custody of AM2 based on Tammy's continued efforts to alienate the children and her noncompliance with court orders. Tammy, on the other hand, contended that AM2 suffered emotionally and physically from Jeffrey's parenting style and the inadequacy of the forced therapy sessions.

At the close of a December 18, 2018 hearing, the court found a change of circumstances or proper cause to revisit the custody issue. After considering the testimony of the reunification therapist and AM2's therapist, the court found that AM2 "refused to engage with counselors, although she had done so in the past" and "engaged in essentially back-channel communications, participating in information gathering to assist her mother in her court battle." The court further

cited "the apparent failure of extensive counseling" as grounds to reconsider the standing custody order. The court subsequently took evidence over several days from January to March 2019, and resolved the custody issue in a written opinion and order on May 28, 2019. Although reluctant to do so given Tammy's conditioning of AM2 to fear and despise her father, the court found that AM2 had an established custodial environment with her mother alone and therefore that Jeffrey had an uphill battle to prove that a change of custody was in AM2's best interest.

The court then considered in depth the best-interest factors of MCL 722.23 and determined that they overwhelmingly weighed in Jeffrey's favor. The court acknowledged Jeffrey's past conduct, but opined with the benefit of hindsight that some of the children's and Tammy's descriptions of Jeffrey's behavior may have been exaggerated or fabricated. The court further noted that Jeffrey had significantly improved with counseling. Tammy's conduct, on the other hand, had significantly deteriorated and given her active opposition to and interference with the therapeutic process, had no chance of improving. Based on the record evidence, the court found that Jeffrey established by clear and convincing evidence that it was in AM2's best interests to grant sole legal and physical custody to him. In addition, the court felt that strong measures were necessary to prevent the completion of Tammy's campaign to alienate AM2 from her father: "Continuation along the current path will only leave this child with a warped and unhealthy relationship with her mother, resting on a shared base of fear, loathing and anxiety, and no relationship with her father." Accordingly, the court determined that Tammy should have only supervised parenting time during therapy sessions and no communication with AM2 unless expressly authorized by a therapist.

Tammy then appealed in this Court.

## II. STANDARDS OF REVIEW

Three different standards govern appellate review of a trial court's decision in a child-custody dispute. "We review findings of fact to determine if they are against the great weight of the evidence, we review discretionary decisions for an abuse of discretion, and we review questions of law for clear error." *Kubicki v Sharpe*, 306 Mich App 525, 538; 858 NW2d 57 (2014). A factual finding is against the great weight of the evidence if the evidence "clearly preponderate[s] in the opposite direction" such that the judgment is a miscarriage of justice. *Fletcher v Fletcher*, 447 Mich 871, 878; 526 NW2d 889 (1994) (cleaned up).[1] A clear legal error occurs when the circuit court "incorrectly chooses, interprets, or applies the law . . . ." *Id.* at 881. "An abuse of discretion exists when the trial court's decision is so palpably and grossly violative of fact and logic that it evidences a perversity of will, a defiance of judgment, or the exercise of passion or bias." *Berger v Berger*, 277 Mich App 700, 705; 747 NW2d 336 (2008).

---

[1] This opinion uses the parenthetical (cleaned up) to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

We review for an abuse of discretion the trial court's underlying evidentiary decisions. See *Varran v Granneman*, 312 Mich App 591, 621; 880 NW2d 242 (2015).

## III. PROPER CAUSE OR CHANGE OF CIRCUMSTANCES

Tammy has appealed in pro per and has made an admirable effort to brief her chief complaints in this Court. She first challenges the trial court's determination that Jeffrey established proper cause or a change of circumstances warranting a reconsideration of the prior custody order. MCL 722.27(1)(c) provides that in a custody dispute, the trial court, for the best interests of the child at the center of the dispute, may "modify or amend its previous judgments or orders for proper cause shown or because of change of circumstances." However, the court is not permitted to "modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." *Id*. "These initial steps to changing custody—finding a change of circumstance or proper cause and not changing an established custodial environment without clear and convincing evidence—are intended to erect a barrier against removal of a child from an established custodial environment and to minimize unwarranted and disruptive changes of custody orders." *Vodvarka v Grasmeyer*, 259 Mich App 499, 509; 675 NW2d 847 (2003) (cleaned up). As described in *Vodvarka*, 259 Mich App at 512-514:

> [T]o establish "proper cause" necessary to revisit a custody order, a movant must prove by a preponderance of the evidence the existence of an appropriate ground for legal action to be taken by the trial court. The appropriate ground(s) should be relevant to at least one of the twelve statutory best interest factors, and must be of such magnitude to have a significant effect on the child's well-being.
>
> \* \* \*
>
> [T]o establish a "change of circumstances," a movant must prove that, since the entry of the last custody order, the conditions surrounding custody of the child, which have or could have a *significant* effect on the child's well-being, have materially changed. Again, not just any change will suffice, for over time there will always be some changes in a child's environment, behavior, and well-being. Instead, the evidence must demonstrate something more than the normal life changes (both good and bad) that occur during the life of a child, and there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child. This too will be a determination made on the basis of the facts of each case, with the relevance of the facts presented being gauged by the statutory best interest factors. [Emphasis in original.]

As recently stated by the Supreme Court, "it is critical that trial courts, in the *first* instance, carefully and fully comply with the requirements of MCL 722.27(1)(c) before entering an order that alters a child's established custodial environment" as "[a]ny error in this regard may have

-6-

lasting consequences yet effectively be irreversible." *Daly v Ward*, 501 Mich 897, 898; 901 NW2d 897 (2017).

Jeffrey established proper cause and a change in circumstances by a preponderance of the evidence as required in *Vodvarka*, 259 Mich App at 512. The court had already determined in 2012 that Tammy actively sought to undermine Jeffrey's relationship with the children and that Tammy's conduct rose to the level of abuse. Tammy took no action to rectify her extreme positions in the four years that Jeffrey was completely denied any parenting time. In 2016, the court initiated a parental reunification process that included counseling for all individuals involved and supervised therapeutic parenting-time sessions. Tammy continued to interfere with Jeffrey's relationship with the children and actively obstructed the therapeutic process. Evidence supported that Tammy had swayed her children to distrust any therapist that did not adopt their viewpoints wholesale. Tammy's own counselor reported that Tammy distrusted therapists "and anyone who might (even gently) challenge her thinking" such that she was unlikely to continue therapy on her own. The court then ordered extended parenting-time periods for Jeffrey without interruption by Tammy. In response, Tammy escalated her interference and alienation behaviors and even encouraged her children to spy for her, leading the court to hold her in contempt and impose a jail sentence.

Tammy contends that several mischaracterizations of fact, erroneous factual findings, and overall misconceptions invalidate the trial court's finding of proper cause or a change in circumstances. First, Tammy contends that MCL 722.23(j) permits a parent to isolate a child from the other parent to protect the child from abuse. The statute provides that one best-interest factor to consider when undertaking a custody analysis is:

> The willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents. A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent. [MCL 722.23(j).]

Her actions, Tammy insists, were reasonable as she was protecting her children from Jeffrey's abuse. As such, Tammy contends that if her acts amounted to parental alienation, they would not justify a finding of proper cause or a change in circumstances.[2]

---

[2] Tammy also essentially contends that "parental alienation" is junk science. While there may be a dispute in the scientific community about whether there is a diagnosable, pathological condition called parental alienation syndrome, see, e.g., Nichols, *Toward a Child-Centered Approach to Evaluating Claims of Alienation in High-Conflict Custody Disputes*, 112 Mich L Rev 663 (2014), there is no reasonable dispute that high-conflict custody disputes frequently involve acts by one parent designed to obstruct or sabotage the opposing parent's relationship with the child.

" 'It is presumed to be in the best interests of the child to have a strong relationship with both of his or her parents.' " *Luna v Regnier*, 326 Mich App 173, 180; 930 NW2d 410 (2018), quoting MCL 722.27a(1). To this end, factor (j) of the best-interest factors favors parents who facilitate the relationship of their children with the other parent. But if the parent overcomes the presumption with evidence that separation from the other parent is necessary for the child's safety, the parent's acts cannot be counted against him or her.

Related to factor (j), Tammy asserts that the court should have treated this as a hybrid case of abuse and parental alienation, that the court erroneously minimized Jeffrey's abuse, and that the court wrongfully faulted her for the failure of the therapeutic process. However, the court thoughtfully and thoroughly supported its factual findings. And to the extent the court's findings were based on its assessment of the witnesses' credibility, we must defer to the court's determinations "given its superior position to make these judgments." *Shann v Shann*, 293 Mich App 302, 305; 809 NW2d 435 (2011).

At the December 18, 2018 hearing, Van Gunst testified that during the reunification therapy process, Jeffrey had "been patient and expressed love and concern, offered opportunities, solutions." In contrast, Tammy still had not given AM2 "permission to enter into a relationship with her dad." Tammy continued to "encourage[]" AM2's negative attitude toward and treatment of Jeffrey. At the last family meeting at the end of July 2018, AM2 still showed signs of being swayed by Tammy's alienating behaviors as her description of a family vacation with Jeffrey, his fiancée and her daughter vastly differed from the descriptions of the others involved and AM2 insisted in therapy that she "was just faking" having fun with her father. Van Gunst opined that AM2 had "a vested interest in keeping me believing, keeping everyone around her believing that it's horrible with her dad." At that final meeting, Van Gunst recommended that reunification therapy cease because it "simply exacerbated and fueled [AM2's] fire." Ultimately, in comparison to other "high-conflict parental alienation cases," Van Gunst ranked this case "at a nine or a ten." Van Gunst recommended that the court "disconnect [AM2] from mom, extended family, and . . . the community that she has lived in" in order to complete the reunification process.

Lesley Menhart testified that the children were very angry at Jeffrey, but that many of their concerns were proven false over time. He further opined that AM2 was difficult for Jeffrey to deal with and he was "frustrated," but had handled everything appropriately. Menhart's last session with AM2 was on November 12, 2018, and he noted that the entire process had not gone well: "It feels like when a therapist is involved at this point, she has to show how much she hates her father and I feel like the level of disrespect increases and any attempt at engaging her in any part of that process is met with complete silence. She might simply stare straight at the person." Overall, Menhart had "never seen such a lack of engagement in 25 years of counseling with a child." Menhart believed that MM and AM2 suffered from post-traumatic stress disorder, but not "because of what necessarily dad has done." Rather, Menhart believed that Tammy had caused this condition: "I feel like they've been provided inaccurate information by mom that has resulted in them having a very intense level of fear, anxiety, and anger at their dad that is not warranted." Menhart had observed Tammy acting "openly hostile towards [Jeffrey] in front of the children and said things that simply weren't accurate," as recently as a year earlier. Jeffrey, on the other hand, had been appropriate, tried to engage the children in activities, and had reacted appropriately even when the children were "angry and in his face and yelling and screaming."

Ultimately, Menhart rated this case of parental alienation as a nine and asserted that AM2 should have no contact with her mother, the maternal side of his family, or her community, which included dance, church, and school.

The trial court credited this evidence over Tammy's claims that the therapy methods were inadequate and that Jeffrey's historic conduct was fully to blame for the children's attitudes. In the subsequent May 28, 2019 custody order, the court expounded on its analysis that proper cause or a change in circumstances warranted further review, truly clarifying that the court's focus was on AM2's best interests based on the evidence:

> [I]t has been shown that [Tammy's] stubborn hatred of [Jeffrey] and her undermining of the agreed custodial relationship has been significant and ongoing, and that it has grown to involve surreptitious communications with [AM2] to enlist the child as a co-conspirator in that effort. These are not minor disputes over contempt and parenting time. These are matters that could have a significant effect on the child's life, including on her long-term mental and emotional health: having to maintain the perception of hatred and contempt toward her father—which she may or may not share with her mother—will undoubtedly affect her mental and emotional health as well as her long-term relationship with her father.

Tammy challenges certain additional factual findings underlying the court's decision. Tammy contends that the trial court improperly admitted her emails as evidence of back-channel or surreptitious, information-gathering communications. Contrary to Tammy's assertion, these emails were not admitted for an improper hearsay purpose. " 'Hearsay' is a statement, other than one by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). The court did not admit the emails to prove the truth of the matters asserted; it allowed Jeffrey to admit them as evidence that there was constant contact between AM2 and Tammy during Jeffrey's parenting time and to show Tammy's purpose for the communications. The value of the emails was to prove the effect on AM2, not to prove the truth of their content. Tammy also could not claim unfair surprise by the admission of the emails. Tammy conceded at the hearing that she did in fact send the emails and remembered the email conversations with her daughter. See, e.g., *People v Taylor*, 159 Mich App 468, 488-489; 406 NW2d 859 (1987) (stating that a party cannot complain of nondisclosure where he or she authored the document and therefore had knowledge independent of discovery).

And the emails tended to establish that Tammy encouraged AM2 to spy for her. Although Tammy claims that AM2 used these emails as a type of journal, that was not the message conveyed. The emails appeared to be log entries that cataloged what Jeffrey said and did during his parenting time. Tammy responded to one email with the exhortation: "good girl, keep them coming." In another message, Tammy asked AM2 whether she recorded Jeffrey's statement. When AM2 replied that she had not done so because she was not prepared for it, Tammy responded that she should always be prepared. AM2 suggested that Tammy should forward the email to her attorney, but black out her email address.

Tammy also takes issue with the court's mischaracterization of the event during which MM left Jeffrey's home for good. We agree that certain descriptive errors were made.

However, any error was harmless and does not warrant relief. Although the trial court misstated the order of events and got certain facts wrong, it did so in a recitation of the procedural history. The trial court did not identify this incident as being particularly important to its resolution of any material factual dispute. And in the end, this case is about custody of AM2 alone, not MM. Accordingly, the information was no longer relevant when the court made its final decision.

## IV. MEDICAL RECORDS

Tammy challenges the trial court's purported refusal to admit all of AM2's medical records into evidence. AM2 suffered a prenatal stroke that led to cerebral palsy. As a result, AM2 has required significant medical attention throughout her life. As AM2 aged, she often complained of muscle and joint pains and required physical therapy. At issue in the custody battle was whether any of AM2's symptoms were psychosomatic or exaggerated to gain leverage in the custody battle. Also at issue was whether Tammy purposely avoided including Jeffrey in AM2's medical appointments. Tammy also complains that Jeffrey ignored AM2's medical needs and that this factor should have weighed in her favor.

On appeal, however, Tammy does not identify any particular record that the court excluded from evidence. In fact, the court actually admitted every medical record that Tammy's counsel proffered, although conditionally. Tammy does not contend on appeal that the conditional admittance of the records was improper. Absent any meaningful discussion of this issue, there simply is nothing for this Court to review. This claim of error is therefore abandoned. *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959).

## V. SEARCH AND SEIZURE

Finally, Tammy contends that the trial court violated her right to be free from unreasonable searches and seizures when it ordered her to turn over her cell phone for forensic examination. We review de novo questions of constitutional law. See *In re Sanders*, 495 Mich 394, 403-404; 852 NW2d 524 (2014). This Court reviews a trial court's decision to order discovery for an abuse of discretion. See *Augustine v Allstate Ins Co*, 292 Mich App 408, 419; 807 NW2d 77 (2011).

As part of its order resolving the custody dispute and competing motions for contempt, the trial court granted Jeffrey's request for an order compelling Tammy to turn over her cell phone for forensic examination. The court's order responded to evidence that Tammy had used her phone to communicate with AM2 and encourage her to gather information for use against Jeffrey in the litigation and would likely continue to do so in the future. The trial court provided Tammy with several procedural safeguards to ensure that the information gathered from the phone would not be disseminated beyond the persons involved in the litigation and that it would be destroyed once it was no longer needed. More specifically, the court ordered Tammy, through her attorney, to turn her cell phone over to a forensic professional for a 24-hour period. The professional would search the phone based on limited search terms and produce a report that could be reviewed by the attorneys, but not the parties. Tammy's attorney could challenge privileged information that would be redacted before the court's in camera review. We note that Tammy has yet to produce her phone for examination, but in the meantime, she and AM2 have been ordered to "preserve all electronic files on" their phones.

The Fourth Amendment safeguards the privacy and security of individuals against arbitrary invasions by government agents. See *Carpenter v United States*, 585 US ___; 138 S Ct 2206, 2213; 201 L Ed 2d 507 (2018). It accomplishes that goal by prohibiting unreasonable searches and seizures. *Id.* at 2214. However, the amendment does not apply to the actions of private parties. See *United States v Jacobsen* 466 US 109, 113; 104 S Ct 1652; 80 L Ed 2d 85 (1984). To the extent that a discovery order entered by a trial court in a civil lawsuit constitutes a search by a government agent within the meaning of the Fourth Amendment, the search would be reasonable if entered by a neutral judge in accord with "closely circumscribed" rules that provide safeguards equivalent to probable cause. See *Bowerman v MacDonald*, 431 Mich 1, 19-20; 427 NW2d 477 (1988) (rejecting the contention that the Fourth Amendment barred a trial court from ordering a blood test in a paternity action because the statute provided for safeguards greater than probable cause).

Michigan's court rules regulate the use of discovery in a civil proceeding. Although the scope of discovery is broad, the discovery must be relevant to the subject matter and must not be privileged. See MCR 2.302(B)(1). Moreover, to the extent that a party or person from whom discovery is sought objects to a discovery request, that party or person may seek a protective order to prevent annoyance, embarrassment, oppression, or undue burden or expense. See MCR 2.302(C). The rules further authorize trial courts to provide significant protections against unreasonable discovery requests. See MCR 2.302(C). And improper discovery requests may be subject to sanction. See MCR 2.302(G). Finally, a party aggrieved by a trial court's decision to order discovery may appeal the trial court's decision to this Court. See MCR 7.203(B)(1). Accordingly, the court rules provide adequate protections to ensure that properly made discovery orders are reasonably consistent with the Fourth Amendment. See *Bowerman*, 431 Mich at 19-20.

In this case, Jeffrey moved to compel discovery of Tammy's phone after he discovered evidence that Tammy was using her phone to communicate with AM2 in violation of the court's orders. The evidence presented thus far amounted to probable cause to believe that Tammy's phone had evidence relevant to the trial court's orders governing custody and was consistent with the requirements of MCR 2.302(B)(1). While the trial court entered the order after resolving the custody dispute, the court's orders governing custody remained in force and Tammy's history of repeatedly violating orders and interfering in Jeffrey's relationship with the children constituted cause to believe that she would continue to engage in such behavior. As such, the order was not beyond the scope of discovery. See MCR 2.302(A)(4). Tammy opposed the motion, and the parties had the opportunity to argue their respective positions before the trial court. Additionally, the court entered a protective order to limit the risks associated with the discovery as permitted under MCR 2.302(C). Under the totality of the circumstances, the protections afforded to Tammy exceeded those applicable when police officers make a warrant request. See *People v Martin*, 271 Mich App 280; 721 NW2d 815 (2006) (noting that a magistrate's decision to issue a warrant will not be disturbed if a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause). Consequently, the order was reasonable within the meaning of the Fourth Amendment.

Tammy also argues that the order violated her attorney-client privilege. The trial court's authority to order discovery does not generally apply to privileged material. See MCR 2.302(B)(1); see also *Augustine*, 292 Mich App at 420-421. However, the court already

-11-

formulated a protection plan in case any privileged communications find their way into the forensic report.

## VI. TAMMY'S FUTURE PARENTING TIME

Although we affirm the trial court's custody order, we are concerned that Tammy has been completely unable to visit or communicate with AM2 since the order issued. The court ordered parenting-time to be supervised by Van Gunst and precluded any outside communication unless Van Gunst determines that it would be in AM2's best interests. However, according to Tammy, Van Gunst has refused to participate in any supervised parenting-time sessions until Tammy makes payments, which Tammy claims she cannot afford. If this is true, it is quite troubling as the trial court has already determined that it is in AM2's best interests to have a relationship with both parents and a complete deprivation of contact with either parent is against the child's best interests. Within the last month, the trial court issued orders attempting to alleviate this issue. In the event the problem has not resolved, Tammy is free to file a new motion below. If she does, the court must consider the financial impact of its orders and craft any remedy necessary to promote AM2's best interests. We highlight that which the trial court so adroitly communicated throughout these challenging proceedings: it is in a child's best interests to have a healthy relationship with *both* parents.

We affirm.

/s/ Jane E. Markey
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly

-12-